IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CERTAINTEED CORPORATION,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>BOISE CASCADE CORPORATION,  )<br>)<br>Defendant.  )  | Civ. Action No. 02-2677<br><br>Hon. William H. Yohn |

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE PROPOSED EXPERT REPORT AND TESTIMONY OF WILLIAM WEILBACHER

Among the 5 experts Defendant proposes to parade in this trademark infringement case is William Weilbacher. Apparently hoping the mere mention of a survey will save its case, Defendant hired Mr. Weilbacher to conduct a "Confusion Study." Mr. Weilbacher describes the purpose of his study as determining whether employees in architecture firms and employees in building/construction firms "associate the phrase 'Building Solutions' with both Plaintiff and Defendant."[1]

The Weilbacher survey is rife with methodological flaws. There are at least five separate substantive flaws, ranging from use of a skewed universe of respondents … to misleading and leading questions … to lack of a purchasing context … to testing respondents' memories instead of present sense impressions. Each of these flaws alone is a sufficient ground for this Court to preclude the survey and any related testimony. In combination, the effect of the flaws on the survey is lethal.

Because the survey's numerous and flagrant flaws render it untrustworthy and unreliable, the survey is inadmissible and must be precluded.

---

[1] Expert Report of Michael Weilbacher, April 23, 2003 ("Weilbacher Rpt.") at 1, attached as Exhibit A.

**I.      Brief Background and Case Status**

This is a trademark dispute about use of the mark BUILDING SOLUTIONS.  Plaintiff, CertainTeed Corporation ("CertainTeed"), owns two federal trademark registrations for the term BUILDING SOLUTIONS, and has for more than ten years used the mark in connection with, among other services, marketing programs directed to the building and construction industry.

In March 2002 Boise announced a company-wide rebranding effort that included renaming its Building Materials Division to "BOISE BUILDING SOLUTIONS."  When Boise refused to cease use of the term BUILDING SOLUTIONS, CertainTeed filed this action, asserting various Lanham Act claims.  Boise has since extended its use of the name BOISE BUILDING SOLUTIONS on its website and its advertising and promotional material, and has also started using the mark A BOISE BUILDING SOLUTION.

Pursuant to the Court's Scheduling Order, the parties exchanged expert reports on April 25.  Mr. Weilbacher's Report is one of five submitted by Boise.  Expert witnesses in this matter must be deposed by May 20, 2003.

**II.     Admission of Expert Testimony Under Evidence Rule 702 and *Daubert***

Expert testimony is only admissible if the proposed expert "is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 (1993).  The trial court is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Id.* at 589*; see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147-48 (1999).  Expert testimony must be grounded in testable, reliable methods and procedures to be admissible in the Third Circuit.  *See Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741-43 (3d Cir. 1994); *Heller v. Shaw Indus., Inc.*, No. Civ. A. 95-7657, 1997 WL 535163, at *7 (E.D. Pa. Aug. 8, 1997)

2

(J. Yohn) ("[T]he facts and data upon which an expert relies in reaching a conclusion must be of a type reasonably relied upon in the particular field.").

The Third Circuit interprets the *Daubert* standard to require the offering party to demonstrate that:

1. the proposed expert is Q*ualified:* the witness must have sufficient qualifications in the form of knowledge, skills, and training;

2. the proposed testimony is *Reliable:* the expert testimony must be grounded in testable, reliable methods and procedures, rather than subjective belief or unsupported speculation; and

3. the proposed testimony *Fits the Case:* the testimony must assist the trier of fact with the particular facts of the case.

*Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741-43 (3d Cir. 1994).

It is the burden of the party offering the expert testimony to establish these three requirements. *See Oddi v. Ford Motor Co.,* 234 F.3d 136, 144 (3d Cir. 2000). As established below, the Weilbacher survey and proposed testimony do not meet these requirements and should be excluded.

### III.  The Survey is Rife With Flaws and Therefore Inadmissible.

Mr. Weilbacher's survey falls well below the relevant standards. Set forth below are 5 of the most egregious and fatal flaws in the survey that render it unreliable and therefore inadmissible.

#### A.  Flaw #1:  Skewed Universe of Respondents

In order to constitute admissible expert evidence, a survey must be directed to the proper universe of respondents. *Prince Mfg., Inc. v. Bard Int'l Assocs., Inc.*, 11 U.S.P.Q.2d 1419, 1425 (D.N.J. 1988); *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978). Surveys directed to over-inclusive or under-inclusive universes are unreliable and therefore

3

inadmissible.  *See, e.g.*, *J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp.2d 358, 371 (D.N.J. 2002).

The Weilbacher survey is unreliable because it is directed to an improper universe.  The universe is both under-inclusive as to geography and over-inclusive as to the nature of the respondents.

As to geography, the survey was directed to a relatively small number of respondents in a small number of locations.  It failed to survey respondents in the full range of markets in which CertainTeed and Boise do business.  It failed to take into account the primary geographic locations in which CertainTeed and Boise do business.  It fails to take into account the strength of their businesses in any locations.

As an initial matter, the stated basis for the geographic regions to which the survey was directed is wrong.  Although Mr. Weilbacher says he directed his survey to "ten SMSA's," "SMSA" is no longer an accepted population measure.  *Statistical Abstract of the United States: 2002*, U.S. Bureau of the Census at 908, attached as Ex. B (designation changed from SMSA to MSA in 1983 to MA in 1990).

The survey is geographically under-inclusive because it fails to reflect the parties' actual market bases.  There is absolutely no indication in the Weilbacher survey of the percentage of business done by Boise or by CertainTeed in the markets surveyed, individually or in the aggregate.  Boise is based in Boise, Idaho.  Its non-wood product business (insulation, composite decking, roofing) is weaker in the East than in the West.  *See, e.g.*, Hogg Dep. at 73-74, attached as Ex. C.  CertainTeed is based in Valley Forge, Pennsylvania.  CertainTeed's strongest geographic market has been in the eastern region of the U.S.  Of the ten cities surveyed, only two are within 500 miles of the parties' primary locations:  Boston and Portland.  There is no

explanation of why the remaining eight cities—ranging from Cleveland to San Diego—were selected.

This lack of "fit" between the sites of the Weilbacher survey and the parties' primary businesses renders the survey results unreliable for this case. Absent a showing of the fit between the markets surveyed and the parties' actual markets, the selection of respondent locations renders the "results" meaningless to this case. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (rejecting survey because, out of the 10 cities surveyed, 8 had no outlets of defendant Domino's Pizza, and remaining 2 outlets had been open for less than 3 months); *Exxon Corp. v. Xoil Energy Resources, Inc.*, 552 F. Supp. 1008 (S.D.N.Y. 1981).

Turning to the nature of the respondents themselves, the survey suffers the same type of "fit" flaw. To be reliable and therefore admissible, a survey should be directed to and reflect actual purchasers of the goods and services at issue, not those who "influence" purchasing decisions. *See, e.g., J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp.2d 358, 371 (D.N.J. 2002); *American Home Prod. Corp. v. Barr Lab.*, 656 F. Supp. 1058 (D.N.J. 1987). The Weilbacher survey was not and does not. Mr. Weilbacher chose to survey a 50/50 split of architects and builders. But there is no indication in the report of the ***basis*** for that selection of respondents. Mr. Weilbacher cites no evidence of the percentage of business attributed in the actual marketplace to those two groups. In reality, the number of builders in CertainTeed's BUILDING SOLUTIONS program exceeds the number of architects in the program. This is yet another example of the lack of "fit" between Mr. Weilbacher's survey and commercial reality.

Still another example of the gap between commercial reality and the Weilbacher survey is the erroneous assumption that architects purchase building materials. *See, e.g.,* Weilbacher Rpt. at 1; interviewers requested name of a person in architecture firm who is responsible for

5

"recommending or specifying" particular construction products to be used in a building designed by the firm). Although architects may sometimes specify particular products, they are not the primary actual purchasers of building products—those actual purchasers are the builders. The impact of this flaw in the survey design is seen in the differing results of the survey as between architect respondents and builder respondents—for example, nearly 70% of the builders interviewed had heard of the phrase BUILDING SOLUTIONS, as versus 30.5% of the architects. *Id.* at 10. Clearly these differing results parallel the marketplace reality that it is builders, not architects, who make actual purchasing decisions. The survey ignores this reality.

For all of these reasons, the Weilbacher survey does not represent and was not directed to the actual universe of the relevant *purchasing* public. It is therefore unreliable and should be precluded by the Court for this reason alone. *See Jaret Int'l Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 73 (E.D.N.Y. 1993) (requiring appropriate universe to include a "fair sampling of those purchasers to partake of the alleged infringer's goods").

### B.     Flaw #2:  Improper Memory-Testing Questions

Proper survey questions must address the respondents' present impressions. *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 296 (2d Cir. 1999). They must not have the effect of acting as a test of memory.

The Weilbacher survey fails to meet this standard. Its questions are structured so that they test the recollection of the respondent instead of the respondent's present sense impressions. Respondents were asked, "Have you ever heard of Building Solutions?" and "Do you recall whether you have ever heard the phrase 'Building Solutions' in association with CertainTeed or with Boise?" Such questions do not test a respondent's present sense impressions of the critical issue in this case: whether the respondent believes that Boise's use of the term BUILDING

6

SOLUTIONS implies some affiliation or connection with CertainTeed. Given that the universe was not limited to potential or actual purchasers of the products at issue, many respondents may not have an opportunity to be exposed to either use of the term "BUILDING SOLUTIONS" so as to form a present sense impression. It is essential that a survey mimic the conditions of the actual market as closely as possibly. *See, e.g.*, *J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp.2d 358, 371 (D.N.J. 2002). There was absolutely no effort by Mr. Weilbacher to replicate the purchasing environment, as is required to produce a reliable, representative survey.

### C.    Flaw #3:  Improper Control Questions

Courts properly require control questions to filter out responses that are the product of general background noise. A control question involves "using a control product, that is, a product that is a non-infringing product which is similar to the products at issue." *Ironclad, LP v. Poly-America, Inc.*, 2000 WL 1400762, *7 (N.D. Ill); *Pharmacia Corp. v. Alcon Lab. Inc.*, 201 F. Supp.2d 335, 362 (D.N.J. 2002).

The control questions used in the Weilbacher survey are flawed in several respects. Interviewers were told to state:

> Now, I want to ask you about a few phrases that are used to describe particular products or companies. For example, have you ever heard of:
>
> > the document company?
> > the passionate pursuit of perfection?
> > Building Solutions?

(Weilbacher Rpt. at 3, App., Architects Quest. at 3, Builder's Quest. at 3.) The use of the lead-in "used to describe" was improper because it told the respondent, or at least suggested to the respondent, that "Building Solutions" is not a mark.

This is a quintessentially improper control question. First, the first two examples in the series of three terms have no relevance to this case. The first term, "the document company," refers to Xerox.[2] The second term, "the passionate pursuit of perfection," refers to Lexus.[3] Neither has anything to do with the building and construction industry, the field at issue in this case. In order to constitute a proper control question, the question must relate to the issues in the case. *J & J Snack Foods Corp. v. Earthgrains Co*., 220 F. Supp.2d 358, 369 (D.N.J. 2002).

Further, the question improperly confuses the respondent. It first implies that the term "Building Solutions" is *not* a mark because it "describes" a product or company. Then it proceeds to contradict the implication by asking if the respondent is aware of anyone using this "descriptive" phrase. These questions muddle the issue, and they do not address whether BUILDING SOLUTIONS is or is not a mark, whether it is or is not confusingly similar as used by Boise. The assumptions and miscues in the questions render the responses meaningless. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 301 (3d Cir. 1986); *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 793 (5th Cir. 1983).

Second, the question is improperly leading. The interviewer explicitly states that the phrases "*are used to describe* particular products and companies." It essentially instructs the respondent to find some association between each term and a product or company and results in a guessing game on the part of the respondent. It is a non-neutral and risks leading the respondent to answer the survey questions in a certain way.

Moreover, the language refers to a description of a "product or company." In fact, neither CertainTeed nor Boise uses the term "Building Solutions" in connection with a product.

---

[2] *See, e.g.*, U.S. Trademark Reg. No. 2,511,581.

[3] Weilbacher Rpt. at 9.

"Building Solutions" is not a phrase, as the survey introduction indicates; rather, it is a term used to identify a program in the building and construction industry. The interviewer told the respondent that the survey asks about one thing, when in fact, it asks about something entirely different. The misleading nature of the survey's introduction and questions indicates a deliberate attempt to set the tone for the respondent's answers.

A related problem is the fact that the survey inexplicably uses corporate slogans. At a minimum, the survey should have rotated the slogans to vary the order. By always presenting the slogans in the same order, the survey attempts to create a mindset for the respondent, directed away from a program identifier.

In sum, the control question is fraught with unstated assumptions and miscues. The result is that the question fails to test for respondents' perceptions. The flawed control question in the Weilbacher survey renders the entire survey tainted and inadmissible. *See, e.g., Simon Property Group, LP v. Mysimon, Inc.*, 104 F. Supp.2d 1033, 1041 (S.D. Ind. 2000) (rejecting home page survey because, *inter alia*, survey failed to use most basic control by failing to compare potential confusion with respect to other similarly named web sites not related to either party).

### D. Flaw #4: No In-Person Interview At or Near Time of Purchase; Failed to Give Context of Use of Marks

In order to be considered reliable and therefore admissible, a survey should be conducted at or near the time of purchase. *Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352, 357 (7th Cir. 1983); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp.2d 360, 368 (S.D.N.Y. 2000). A survey must show respondents how the marks at issue are actually used in the marketplace; it must disclose the context in which the marks at issue are used. *J & J Snack*

*Foods Corp. v. Earthgrains Co.*, 220 F. Supp.2d 358 (D.N.J. 2002). The Weilbacher survey failed to meet these standards, and should be rejected on this ground alone.

The Weilbacher survey was essentially conducted in a vacuum: over the telephone, with no material shown to respondents. Respondents were not shown the materials on which the names and marks in issue are used or the context in which the names and marks in issue appear.

Moreover, the research did not eliminate any potentially biasing stimuli that could surround the respondents at their offices, where the calls took place. For example, it is entirely possible that one or more respondents had Boise and/or CertainTeed material during the telephone interview, thus influencing those responses when compared with other respondents not surrounded by the products. One way to minimize the effect of such stimuli is to mail the respondent an envelope with relevant material. When the survey is to be conducted, the respondent at that time opens the envelope, reviews the material, and then the interviewer presents the survey questions by telephone. Mr. Weilbacher did not undertake such a methodology here.

Although telephone surveys can be reliable when combined with other methods, such as the preliminary dissemination of materials by mail, they are called into doubt when, as here, they are conducted only via phone and eliminate significant stimuli. *See Inc. Publ. Corp. v. Manhattan Magazine, Inc*., 616 F. Supp. 370, 393 (S.D.N.Y. 1985). Conducted without any relevant stimuli such as the parties' visual materials, the Weilbacher survey is unreliable.

The survey's failure to provide any context to respondents renders it unreliable and inadmissible. *See, e.g.*, *The Upjohn Co. v. American Home Products Corp.*, 1996 WL 33322175 (W.D. Mich.).

10

### E.     Flaw #5:  Lack of Raw Data

Admissible survey evidence must be able to withstand independent review and analysis. *Upsher-Smith Labs, Inc. v. Mylan Labs, Inc*., 944 F. Supp. 1411, 1413 (D. Minn. 1996).  To do so, it must include the raw data on which it is based.

The Weilbacher survey fails in this respect, too.  It does not include any of the underlying raw data, precluding any independent review and rendering it inadmissible.  Nor does it describe in any way the coding frame that was employed, or what responses were coded and by whom, which calls into question the guarantees of reliability and trustworthiness.  Moreover, from the face of the Report, it appears that the results of the Weilbacher survey have never been validated, either by Boise or by an independent party.

*  *  *

These flaws, together and alone, establish that the Weilbacher survey methodology fails to meet the relevant tests for reliable, testable, admissible survey evidence.  It must be excluded. In light of the Weilbacher survey's fatal flaws, CertainTeed will soon undertake its own version of the Weilbacher survey, which promises to be much more reliable and helpful to the Court.

### IV.  Conclusion

Mr. Weilbacher's proposed expert report and "survey" is riddled with many methodological errors and thus does not meet the requirements of Federal Rule of Evidence 702, *Daubert*, and well-established Third Circuit law.  Accordingly, CertainTeed asks the Court to exclude Mr. Weilbacher's proposed testimony and expert report.

Respectfully submitted,

_____
Roberta Jacobs-Meadway
Lynn Rzonca
Richard E. Pierce
Kyrus L. Freeman
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
215-665-8500
Attorneys for Plaintiff

Dated:  May 13, 2003