UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CERTAINTEED CORPORATION,<br><br>        Plaintiff,<br><br>   v.<br><br>BOISE CASCADE CORPORATION,<br><br>        Defendant. | NO. 02-2677<br><br>Hon. William H. Yohn |

## **ORDER**

AND NOW, this _____ day of _____, 2003, upon

consideration of plaintiff's motion to preclude the proposed testimony and expert report of

William Weilbacher, and the submissions of the parties with respect thereto, it is hereby

**ORDERED** that said motion is **DENIED**.

_____
William H. Yohn, Jr., U.S.D.J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CERTAINTEED CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BOISE CASCADE CORPORATION,<br><br>Defendant. | NO. 02-2677<br><br>Hon. William H. Yohn |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
TO PRECLUDE THE PROPOSED TESTIMONY
AND EXPERT REPORT OF WILLIAM WEILBACHER**

## CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   PERTINENT FACTS ............................................................................2

      A.    CertainTeed Claims Exclusive Rights in the Term "Building Solutions".........2

      B.    CertainTeed Claims that Boise's Use of "Boise Building Solutions" is Confusing Customers......................................................................................4

      C.     Mr. Weilbacher's Survey is Objective and Reliable.........................................5

III.  MR. WEILBACHER SHOULD BE ALLOWED TO TESTIFY ..................6

      A.    Fed. R. Evid. 702 and the Third Circuit Liberally Allow Expert Testimony ....6

      B.    The "Universe" of Surveyed Participants is Not Improperly "Skewed" ...........7

      C.    The Questions Are Not "Improper Memory-Testing Questions"....................12

      D.    The Control Questions Do Not Justify the Exclusion of Mr. Weilbacher's Testimony ...........................................................................................13

      E.    A Telephone-Based Survey Did Not Skew the Results in Boise's Favor .......16

      F.    There Is No Lack of Raw Data .......................................................................18

IV.   CONCLUSION.....................................................................................19

## I.   INTRODUCTION

Plaintiff ("CertainTeed") has moved to exclude the reports and testimony of all five of defendant's ("Boise's") expert witnesses. This opposition relates to the report and testimony of William Weilbacher, a recognized expert in trademark surveys, who has conducted a survey that is relevant to whether persons in the construction industry associate the phrase "Building Solutions" exclusively with CertainTeed and whether Boise's use of the term "Boise Building Solutions" is likely to create confusion.

CertainTeed asserts that the phrase "Building Solutions" is "inherently distinctive" and has "come to be recognized as a mark identifying CertainTeed's products and services." Complaint, ¶¶ 2, 38. CertainTeed has used the phrase for a promotional program for builders, and an educational program for architects and remodelers. *See* Complaint, ¶ 1 (alleging use "in connection with marketing materials and educational programs for building contractors and distributors of construction products"). One of the trademark registrations asserted by CertainTeed recites, in relevant part, "preparation of customized marketing information for others, all relating to building materials, for builders, architects and designers . . . ." Complaint, ¶ 16.

Mr. Weilbacher's survey surveyed the two sets of people who, according to CertainTeed's allegations, would most likely know of CertainTeed's use of "Building Solutions" (i.e., builders and architects). The survey asked the objective question whether those surveyed associated the phrase "Building Solutions" with any particular company or product. *Not a single builder or architect spontaneously associated the phrase with CertainTeed.* These results are unquestionably relevant to CertainTeed's claim that the term is well known throughout the industry as relating to CertainTeed.

CertainTeed's complaints as to Mr. Weilbacher's survey are trivial or at least do not justify excluding Mr. Weilbacher or his testimony. In fact, if the survey was skewed at all, it was skewed in CertainTeed's favor because it was directed at the persons most likely to know of CertainTeed's use – builders and architects – and because the leading questions suggested there

might be a relationship between Boise and CertainTeed (e.g., there was no mention of other users of "Building Solutions"). To the extent CertainTeed can raise any basis for arguing that the survey is skewed in Boise's favor, those issues can be raised on cross-examination or in argument as to the weight to be accorded Mr. Weilbacher's testimony. They are not a legitimate basis for excluding the testimony altogether, particularly when this case involves a bench trial.

## II.    PERTINENT FACTS

### A.    CertainTeed Claims Exclusive Rights in the Term "Building Solutions"

This cases arises because CertainTeed claims the exclusive right to use the term "Building Solutions," and claims that Boise's use of the term "Boise Building Solutions" for its business is likely to confuse customers. In addition to seeking an injunction to preclude Boise's use of the term, CertainTeed claims that it is entitled to unjust enrichment damages of more than $3.2 million. CertainTeed makes its claims based on two registrations, and a claim of "common law" rights. One trademark registration – U.S. Trademark Registration No. 2,390,753 – is for the term "Building Solutions" for two narrow sets of services (and services that would not be considered "Building Solutions"). In particular, the services recited in the registration are: (1) "preparations of customized marketing information for others, all related to building materials for builders, architects and designers," and (2) "analysis of electrical power and energy needs of others, consulting services in connection with the design of electrical systems for others."

Boise does not use the term "Building Solutions" or even "Boise Building Solutions" in connection with such services. Nevertheless, CertainTeed asserts that the registration provides it rights against persons and companies that provide building materials and services (i.e., provide "Building Solutions").

CertainTeed's other registration – U.S. Trademark Registration No. 1,823,200 – is for

2

"Building Solutions" adjacent to a sunflower:

Int. Cl.: 37

Prior U.S. Cl.: 103

Reg. No. 1,823,200

**United States Patent and Trademark Office**   Registered Feb. 22, 1994

SERVICE MARK
PRINCIPAL REGISTER

 **Building Solutions**

LETOVSKY, CHARLES (CANADA CITIZEN)
56 PETER BULKELEY RD.
CONCORD, MA 01742

FOR: RESIDENTIAL AND COMMERCIAL
BUILDING CONSTRUCTION; NAMELY, CAR-
PENTRY, ADDITIONS AND DESIGN CON-
SULTING, IN CLASS 37 (U.S. CL. 103).
FIRST USE 12-15-1989; IN COMMERCE
5-10-1990.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "BUILDING", APART, FROM
THE MARK AS SHOWN.

SER. NO. 74-324,766, FILED 10-23-1992.

ROBERT C. CLARK JR., EXAMINING ATTOR-
NEY

This mark, which was purchased by CertainTeed from a contractor (Mr. Letovsky) who operates

a small business in Massachusetts, is for "residential and commercial building construction;

namely, carpentry, additions and design consulting."

Boise does not use a sunflower associated with its business at all and does not provide the

specific services listed in the registration. Nevertheless, CertainTeed is claiming that this

registration also covers Boise's activities.

Finally, CertainTeed claims "common law" rights based on its use of the term "Building

Solutions." In particular, CertainTeed claims that the "BUILDING SOLUTIONS mark . . . is

inherently distinctive when used in connection with the programs, goods and services of

CertainTeed" and that the "BUILDING SOLUTIONS marks have become well and favorably

known to the relevant trade and public and have been and are associated with CertainTeed and

with no other entity in the construction products industry." Complaint, ¶¶ 14-15.

**B.    CertainTeed Claims that Boise's Use of "Boise Building Solutions" is Confusing Customers**

To prevail in this action, CertainTeed must prove that Boise is infringing its trademark rights which, in turn, requires it prove that Boise is engaged in activities that are likely to confuse consumers vis-à-vis CertainTeed's trademarks. *See* Complaint, ¶ 24 (allegation of confusing similarity). In March 2002, Boise, which was then known as Boise Cascade Corporation, adopted "Boise" alone as its corporate brand and dropped its tree logo. Boise's major business units at the time used the terms "products" or "materials" to describe their activities (e.g., "Boise Cascade Office Products," "Boise Cascade Paper Products," and "Boise Cascade Building Materials, Distribution."). Though these divisions were described as providing "products" or "materials," a survey of customers revealed that Boise's business units were known for more than simply providing office, paper and building products; Boise was best known for the expertise of its people and their prompt and reliable service. Because "products" or "materials" did not adequately describe the full range of products, services and expertise provided by Boise, Boise needed a more descriptive nomenclature for its business units. Accordingly, Boise adopted the names "Boise Paper Solutions," "Boise Office Solutions," and "Boise Building Solutions" as the descriptors for its businesses. Though the business unit nomenclature is used to identify the divisions, the nomenclature is always used with the "Boise" name, which is, in most cases, much more prominent (*e.g.*, "***BOISE*** Building Solutions"). Further, the nomenclature is not used to promote Boise's products and services. The "Building Solutions" nomenclature is not, for example, used on any Boise products, product packaging or vehicles. Instead, the name "Boise Building Solutions" is used in a narrow fashion, such as for signage for buildings (none of which are open to the public), investor and corporate materials, and in certain promotional pieces where it is used only to identify the business and only adjacent to and in smaller font than the "Boise" name. *See* example of advertising attached hereto as Exhibit No. 1.

**C.    Mr. Weilbacher's Survey is Objective and Reliable**

With this background, it is easy to understand why Mr. Weilbacher's testimony is important to the Court's consideration of these issues. Mr. Weilbacher is an expert on trademark surveys, as reflected in his background. *See* Exhibit No. 2 (background, including a list of cases in which Mr. Weilbacher has testified as expert). In the instant case, Mr. Weilbacher designed a survey of builders and architects – the persons who, according to CertainTeed, would most likely be familiar with CertainTeed's use of "Building Solutions." The survey asked the participants whether they had "ever heard" of the phrase "Building Solutions," and, if so, whether they associated it with a "particular company or product." *See* Report at 5-6 (explaining three phrases[1] presented to participants). If they answered yes, they were asked to identify the company or product, and explain how they interpreted the phrase in connection with such company or product. They were then specifically, in a leading question, asked whether they had ever heard the phrase associated with Boise or CertainTeed. Again, if there was a yes answer, they were asked "what does the phrase 'Building Solutions' mean" in connection with Boise or CertainTeed, and whether or not they thought Boise and CertainTeed were affiliated in any manner.

Approximately half (49.3%) of the participants indicated they had heard of the term "Building Solutions." Report at 10. Six and one-half percent of the respondents associated the term with a particular product or company. When asked, builders and architects spontaneously associated the phrase with Owens Corning, IBM, Dow Corning, Home Depot and Armstrong. *Id.* at 9-10. *No builder or architect spontaneously associated the term "building solutions" with CertainTeed. Id.* at 11. This result is obviously relevant to CertainTeed's claim that persons in the industry associate the phrase with it.

---

[1] As control questions, the participants were asked the same initial questions for the phrase "the document company" (a tagline used by Xerox) and the "passion or pursuit of perfection" (a tagline used by Lexus).

In response to a leading question as to whether they had heard the term associated with CertainTeed, only 19.4% of the respondents answered affirmatively. Nearly all of these people associated it with the products CertainTeed sells, not CertainTeed's promotional or educational programs. Report at 12-13.

When asked the leading question about Boise, only 8.5% of the respondents answered that they had heard of the term associated with Boise, and they also indicated it was associated with Boise's products.

When asked whether Boise and CertainTeed were affiliated, only 6.5% answered affirmatively and, when asked why, the greatest percentage indicated that they assumed Boise was so big it owned CertainTeed. Report at 16. Only one respondent in the survey answered (in response to the leading question) that he considered "Building Solutions" to be associated with CertainTeed, and also answered that he thought there was an affiliation between Boise and CertainTeed. Report at 17. Further, when asked what the phrase "Building Solutions" meant in connection with CertainTeed, he responded that it "means solutions for the builders in the industry." Report at 17.

The survey is obviously relevant to the merits (or lack thereof) of CertainTeed's claims, and neither the survey nor Mr. Weilbacher's testimony in the survey should be excluded.

## III.    MR. WEILBACHER SHOULD BE ALLOWED TO TESTIFY

### A.    Fed. R. Evid. 702 and the Third Circuit Liberally Allow Expert Testimony

Federal Rule of Evidence 702 allows expert testimony where it "will assist the factfinder." Rule 702 provides three "substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). A trial court has broad discretion to determine the admissibility of expert testimony, and even greater latitude in a bench trial because of the judge's dual role as gatekeeper and factfinder. *See Inc. Publishing Corp. v. Manhattan Magazine, inc.,* 616 F.Supp. 370, 390 (S.D. N.Y. 1985) ("[I]n a non-jury trial, the better course is to 'receive the evidence and then ignore or give it such

weight as the court [thinks] appropriate.'") (quoting *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1202 (E.D. N.Y. 1983)).

The Third Circuit applies "a generally liberal standard" for qualifying experts. *Elcock,* 233 F.3d at 742. As CertainTeed concedes, a witness may be an expert in a specific area because of his or her expertise. There has been no claim that Mr. Weilbacher is not an expert in designing trademark surveys.

Reliability exists if an expert's opinion is based on scientific methods and procedures, so that the expert has "good grounds" for his or her belief. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 (3d. Cir. 1994) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590 (1993)). The standard is not intended to be high; the conclusions should be reliably connected to the facts and methodology, but the plaintiff need not prove its case. *Id.* at 745; *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir. 1999). In this case, Mr. Weilbacher is expressing an opinion based upon a scientific survey, not an absurd scientific theory. Even though CertainTeed raises a number of technical challenges to the survey, those challenges, discussed further below, do not establish that the survey design was unreliable, or even that the survey was improperly biased toward Boise.

Finally, the expert testimony must "fit" – it must assist the trier of fact, relaying some connection between the research or result and a particular factual dispute. *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir. 2000). "This standard is not intended to be a high one." *Id.* at 145; *see also In re Paoli,* 35 F.3d at 744. As noted above, Mr. Weilbacher's survey and his opinion, based upon that survey, are directly relevant to whether "Building Solutions" is associated by persons in the industry specifically with CertainTeed or its products, as opposed to being interpreted as a generic or descriptive phrase for solutions to building problems.

**B.    The "Universe" of Surveyed Participants is Not Improperly "Skewed"**

CertainTeed's technical challenges to the design of the survey do not justify the exclusion of the evidence. CertainTeed's first argument is that the survey is "unreliable because it is

directed to an improper universe." Motion at 4. CertainTeed argues that the universe is "under-inclusive as to geography and over-inclusive as to the nature of the respondents." *Id.* As to geography, CertainTeed argues that it fails "to take into account the primary geographic locations in which CertainTeed and Boise do business." *Id.* In particular, CertainTeed seems to suggest that the survey should have been conducted in the Philadelphia and Boise areas.

This is not supported by the allegations in the Complaint. The Complaint makes no assertions that CertainTeed's rights are limited to any particular areas of the United States. There is no assertion that CertainTeed's "Building Solutions" trademark is known only in the Philadelphia area, or even known more in the Philadelphia area than other areas. Boise and CertainTeed do business nationwide. The survey included participants in Boston,[2] Miami, Atlanta, Cleveland, Kansas City, Minneapolis, Dallas, Denver, San Diego and Portland, a cross section of the entire country. This is a fair cross section across the country, and there is no basis, based upon the assertions in the Complaint, that the survey should have been more limited.

Also, CertainTeed does not explain why the cities chosen would skew the results in Boise's favor. If anything, not having done the survey in the Boise area would favor CertainTeed, not Boise. Persons more familiar with Boise and its products would be presumably be *less* likely to be confused by Boise's use of the term "Boise Building Solutions" or to associate the phrase exclusively with CertainTeed.

CertainTeed argues that the survey "should be directed and reflect actual purchasers of the goods and services at issue, not those who 'influence' purchasing decisions." Motion. at 5. CertainTeed then complains that Mr. Weilbacher should not have chosen a "fifty/fifty split of architects and builders." *Id.* If anything, the survey design skews the results in CertainTeed's favor. Boise sells to buyers at distributors and retail establishments; it does not operate retail

---

[2] The only use of CertainTeed's sunflower trademark (U.S. Trademark Registration No. 1,823,200) is Mr. Letovsky's use, who uses it in the suburbs of Boston. Accordingly, choosing Boston as a survey city would have presumably skewed the results in CertainTeed's favor.

stores, or otherwise sell directly to contractors or architects. Arguably, the survey could have been directed at Boise's customers and potential customers, who would have been *less likely* to associate "Building Solutions" with CertainTeed, since they would know of Boise's use of the term "Boise Building Solutions."

If Mr. Weilbacher had designed the survey in that manner, CertainTeed would certainly have complained loudly. Instead, Mr. Weilbacher structured the survey to favor CertainTeed. If any person would know of CertainTeed's "Building Solutions" program, it should be the builders and architects to whom CertainTeed directs its "Building Solutions" program. CertainTeed's '753 trademark registration also specifies marketing information for "builders, architects and designers." Mr. Weilbacher was extremely reasonable in determining that builders and architects are the persons most likely to know of CertainTeed's program, and thus the persons most likely to identify CertainTeed as associated with the phrase "Building Solutions." If anything, the survey was biased in CertainTeed's favor.

CertainTeed's next complaint – that "'SMSA' is no longer an accepted population measure" (Motion at 4) – is silly. The way the U.S. Census Bureau divides population centers is hardly relevant to whether Mr. Weilbacher's survey is reliable.

Although CertainTeed cites numerous cases to support its objections as to the proper "universe," it does not discuss the facts or holding of the cases, because they do not support the exclusion of Mr. Weilbacher or his testimony. In fact, none of the cases exclude an accused trademark infringer's survey. In the first case cited by CertainTeed – *Prince Mfg., Inc. v. Bard Int'l Assoc., Inc.*, 11 U.S.P.Q.2d 1419 (D.N.J. 1988) – the court found that the plaintiff, a manufacturer of PRINCE tennis rackets, was unlikely to succeed in establishing that defendants use of "BARD PRINCESS" for tennis rackets would cause confusion. The court did *not* exclude any testimony regarding surveys. The court criticized the plaintiff's survey, however, because it dropped the "BARD" name as part of the survey. *See* 11 U.S.P.Q.2d at 1425 ("Such a [likelihood of confusion] test first focuses on the marks themselves and as they are used on the

9

product, which in this case were 'PRINCE' and 'BARD PRINCESS' – not merely 'Princess.'").

The court also noted that the survey did not include the defendant's "'niche market', namely girls

or small women who would buy a $130 racket, or those willing to buy it for them." *Id.* For

these reasons, the court gave the survey only "scant weight." *Id.* at 1426. This reasoning

suggests the survey was skewed in CertainTeed's favor, because Mr. Weilbacher did not use the

complete name – "Boise Building Solutions" – and directed the survey at persons more likely to

be familiar with CertainTeed's use of the phrase. The reasoning certainly does not support the

exclusion of Mr. Weilbacher's testimony.

The next decision relied upon by CertainTeed – *Pittsburgh Press Club v. United States*,

579 F.2d 759 (3d Cir. 1978) – was an action where the Pittsburgh Press Club sought an income

tax refund on the basis that it was a "social club." The club conducted a survey of its members

as to whether the members had participated in social activities at the club. *See* 579 F.2d at 756.

In finding that the survey constituted inadmissible hearsay, the court noted that the taker of the

survey "had never before taken a poll," that the participants "were all club members and thus

interested in the litigation," that the participants "were told the precise nature of the litigation and

the purpose of the survey," and that it was "possible that a recipient of the questionnaire would

fail to respond as he knew an honest response would be harmful to the Club's position." *Id.*

at 759. Accordingly, the court found that the survey was "neither objective, scientific nor

impartial." *Id.* Again, these facts do not support the exclusion of Mr. Weilbacher's testimony.

In the third case cited by CertainTeed – *J & J Snack Foods, Corp. v. Earthgrains Co.*,

220 F. Supp.2d 358 (D.N.J. 2002) – the court granted summary judgment that plaintiff's

registered trademark for "Break & Bake" for frozen cookie dough was invalid because it was

descriptive and had not acquired secondary meaning. In so holding, the court rejected a proposed

survey from the plaintiff. The court first noted, however, that "methodological deficiencies in a

survey generally relate to the weight given the survey's conclusions rather than to its

admissibility." *Id.* at 369. "However, when the deficiencies are so substantial that they render

10

the survey's conclusion untrustworthy, the Court should exclude the survey from evidence." *Id.*
The court found "two substantial flaws" with plaintiff's survey. *Id.* at 370. "The first, and
perhaps clearest, flaw is the uncontroverted definitional problems of the survey." *Id.* With
respect to the proper universe, the court noted that the survey "did not imitate the market
conditions of the J & J product at all." *Id.* at 371. In particular, the sample was not directed at
plaintiff's customers, which were "commercial distributors in the food service industry who may
have had contact with frozen dough products." *Id.* Instead, the survey was directed at ultimate
consumers who would "not have any contact with the 'BREAK & BAKE' mark on J & J's
product." *Id.* at 372. In contrast, Mr. Weilbacher's survey is directed at the very customers who
CertainTeed claims would know about its products -- builders and architects.

The next decision relied upon by CertainTeed – *AmStar Corp. v. Dominos Pizza, Inc.,*
615 F.2d 252 (5th Cir. 1980) – is also distinguishable. In *AmStar,* the court reversed a finding
that the defendants use of "Domino's Pizza" infringed plaintiff's trademark "Domino" for sugar.
The district court had admitted two surveys, and the appellate court did not suggest either was
inadmissible. Instead, the appellate court simply criticized the district court's reliance on the
trademark owner's survey. The appellate court considered the survey skewed in favor of the
trademark owner because it was directed at persons more likely to be aware of the plaintiff's
trademark and unaware of defendant's business. *See* 615 F.2d at 264 ("[P]articipants in
[plaintiff's] survey would have been repeatedly exposed to plaintiff's mark, but would have had
little, if any, exposure to defendant's mark."). Under this reasoning, Mr. Weilbacher's survey is
improperly tilted towards *CertainTeed* because it was directed at CertainTeed's potential
customers, as opposed to Boise's customers.

The next case relied upon by CertainTeed – *Exxon Corp. v. Xoil Energy Resources, Inc.,*
552 F. Supp. 1008 (S.D.N.Y. 1981) – also does not support CertainTeed's position. In *Exxon,*
the court denied a motion for preliminary injunction, finding that Exxon had not shown a
likelihood of confusion by defendant's use of XOIL. The court did not hold any surveys

11

inadmissible. The court did, however, accord no weight to the plaintiff's survey, which was "conducted by attorneys associated with [the plaintiff's] law firm." *Id.* at 1020. The court found that the survey was improperly directed at a single geographic area (New York area) and that there was a conscious effort to "approach [ ] members of the public from affluent areas who appear to be prosperous and a business man or professional type of individual." *Id.* at 1021. There were even "large signs bearing plaintiffs logo [ ] visible from some of the test sights or on the way to some of the test sights." *Id.* at 1022. Again, Mr. Weilbacher's survey did not suffer from these infirmities.

The remaining cases cited by CertainTeed on this issue are similarly unpersuasive. *See, American Home Prod. Corp., v. Barr Lab.,* 656 F. Supp. 1058, 1070 (D.N.J. 1987) (in finding that trademark owner had failed to prove likelihood of confusion, the court admitted trademark owner's survey but gave it "very little weight" for various reasons); *Jaret Int'l. Inc. v. Promotion in Motion, Inc.,* 826 F. Supp. 69, 73 (E.D.N.Y. 1993) (in granting partial summary judgment to accused infringer, the court found trademark owner's survey biased because it was taken where only plaintiff's products were sold).

**C.    The Questions Are Not "Improper Memory-Testing Questions"**

CertainTeed's next objection is that the survey improperly tests "the recollection of the respondent instead of the respondent's present sense impressions." Motion at 6. CertainTeed argues that asking whether a builder or architect has "ever heard of the phrase 'Building Solutions'" is improper. *Id.* This complaint makes no sense. CertainTeed is claiming that the phrase is well known, and associated with it. Asking builders and architects whether they have ever heard of the phrase is directly relevant to whether CertainTeed's claim is true.

The two cases relied upon by CertainTeed on this issue do not support CertainTeed's position. In *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 296 (2d Cir. 1999), for example, the Court did reject the plaintiff's survey as "little more than a memory test," but in very different circumstances. In *Starter*, the plaintiff's survey displayed certain shoes, then the shoes were

"covered with a cloth and an interviewer asked the respondent to indicate which shoe he preferred and to identify the names of the shoes." *Id.* F.3d at 297. The Court found this type of "memory test" not to be relevant to likelihood of confusion. *Id.* The only other case relied upon by CertainTeed is similarly inapplicable. *See J & J Snack Foods,* 220 F. Supp.2d at 371 (in granting summary judgment that plaintiff's registered trademark for "Break and Bake" was invalid as descriptive, the court noted that plaintiff's survey was improperly directed at end users who never saw the use of the mark, as opposed to "commercial distributors in the food service industry who may have had contact with frozen dough products").

**D.    The Control Questions Do Not Justify the Exclusion of Mr. Weilbacher's Testimony**

CertainTeeds' next complaint is about the initial "control questions." CertainTeed complains that the questions were improper because the interviewer indicated that he was going to ask "about a few phrases that are used to describe particular products or companies." Motion at 7. CertainTeed claims that the use of the word "describe" "suggested to the respondent that 'Building Solutions' is not a mark." *Id.*

This argument has no merit. First of all, a "descriptive" term can have trademark protection if it has acquired, as CertainTeed claims, secondary meaning. Second, builders and architects are unlikely to be so well-versed in the subtleties of trademark law that they would recognize that the use of the work "describe" was inconsistent with a phrase being a trademark.

CertainTeed's reliance on the *A. J. Canfield* and *Zatarains* decisions on this issue is misplaced. In *A. J. Canfield,* the Third Circuit affirmed the district court's refusal to enjoin the defendant from using the term "chocolate fudge" in connection with diet soda. The Third Circuit held "the designation 'chocolate fudge' for diet soda generic [and] hence unprotectable . . . ." 808 F.2d at 292. The district court did not exclude any survey evidence, and the Third Circuit did not suggest that any such evidence should have been excluded. The Third Circuit did hold, however, that the plaintiff's survey should have been discounted. In particular, plaintiff claimed that the survey demonstrated that "chocolate fudge soda" was not generic, because participants

did not identify it as a "chocolate fudge drink" when asked what "kind of drink" it was.  808 F.2d at 302.  The Third Circuit held that the survey did not properly differentiate "the product brand from the product genus."  *Id.*  These comments have no application to Mr. Weilbacher's survey design.

Similarly, in *Zatarains, Inc. v. Oak Grove Smokehouse*, 698 F.2d 786 (5th Cir. 1983), the Fifth Circuit affirmed, among other things, that the defendants had the right to use the term "fish-fry" to describe their goods, and that the term "Chick-Fri" was descriptive without secondary meaning, thus justifying the cancellation of plaintiff's trademark registration.  Again, there is no indication that the district court excluded any survey evidence, and the Fifth Circuit did not suggest any evidence should have been excluded.  The court agreed, however, that plaintiff's survey attempting to establish secondary meaning for the term "Chick-Fri" was entitled to "little evidentiary weight" for various reasons, none of which apply to Mr. Weilbacher's survey.  698 F.2d at 797 (noting that only persons who had fried fish or other seafood three or more times a month were qualified to answer questions, although that seemed to have nothing to do with knowledge of "Chick-Fri," and that, in any case, the results of the survey were inconclusive).

CertainTeed also complains that asking participants whether they had heard of the phrase "Building Solutions" to describe a product or company was misleading, because "neither CertainTeed nor Boise uses the term 'Building Solutions' in connection with a product."  *Id.* at 8.  This is a surprising position, since CertainTeed asserts in the Complaint that it "uses the BUILDING SOLUTIONS programs materials to market many different lines of construction products."  Complaint at ¶ 9.  CertainTeed expressly asserts that it has "used the mark BUILDING SOLUTIONS on and in connection with point of sale materials for a full range of construction products, including siding, roofing, decking, railing, fencing and insulation, windows, ventilation products and pipe and foundation products."  Complaint at ¶ 10; *see also* ¶ 38 ("The BUILDING SOLUTIONS mark is inherently distinctive as a mark for construction

products of CertainTeed. . . ."). For CertainTeed to now advise the Court that it does not use the term "in connection with any product" is inconsistent, at best.

CertainTeed also complains that "'Building Solutions' is not a phrase, as the survey introduction indicates; rather, it is a term used to identify a program in the building and construction industry." Motion at 9. This complaint is trivial. Asking whether interviewees have heard of the phrase "Building Solutions" hardly skews the results in Boise's favor, or is otherwise misleading.

CertainTeed also suggests the control questions were improper because they refer to tag lines of Xerox and Lexus, that have no relevance to the building and construction industry. CertainTeed does not explain, however, how this could cause the survey to be unfairly biased toward Boise. Further, the first case cited by CertainTeed on this question is the *J & J Snack Foods* decision, where the court granted summary judgment against the trademark owner. Although the court criticized the trademark owner's survey, it made no reference to improper control questions. The other case relied upon by CertainTeed on the control question issue is *Simon Property Group, LP v. Mysimon, Inc.*, 104 F. Supp. 2d 1033, 1041 (S.D.Ind. 2000). In *Simon Property*, the plaintiff, an owner and operator of shopping malls, asserted that defendant's use of the term "Mysimon" for an Internet comparative shopping service was likely to cause confusion. The court rejected plaintiff's survey asking shoppers at a mall whether they thought printouts from the home pages of the two companies were from affiliated companies because of "three serious flaws: (a) it grossly distorts the 'marketplace conditions' in which Internet users might actually encounter the two parties' marks together; (b) it fails to use the most basic control by failing to compare potential confusion with respect to other 'Simon' websites not related to either of these parties; and (c) it is designed to create 'demand effects' that will appear to exaggerate unfairly any possible confusion about affiliation. . . ." *Id.* at 1041. With respect to "controls," the court found the survey was skewed in plaintiff's favor because it did not show other uses of "Simon" on the Internet. *Id.* at 1046. This reasoning suggests that Mr.

15

Weilbacher's survey is skewed in favor of CertainTeed, not Boise. In particular, the survey would have been more objective if it had asked about all of the other third-party users of "Building Solutions" and then asked whether any of the companies were affiliated. Leading questions as to whether the participants had heard of Boise's or CertainTeed's use of the phrase, and then asking whether those two companies are affiliated, skewed the results, as the Court in *Simon Property* noted, in CertainTeed's favor. This makes the actual results even more convincing.

**E.    A Telephone-Based Survey Did Not Skew the Results in Boise's Favor**

CertainTeed also complains that the survey was skewed because it was "over the telephone, with no materials shown to respondents." Motion at 10. CertainTeed argues that the survey "must show respondents how the marks at issue are actually used in the marketplace," suggesting Mr. Weilbacher could have mailed the respondents "an envelope with relevant material." Motion at 9-10.

Again, CertainTeed does not explain how the use of the telephone biased the survey. CertainTeed also does not explain precisely what materials should have been sent to respondents or why. In fact, sending Boise or CertainTeed literature would have undermined one of the key purposes of the survey. A key purpose was to determine whether, as CertainTeed claimed, persons in the industry associate the term "Building Solutions" with CertainTeed. Sending the respondents CertainTeed promotional material with "CertainTeed Building Solutions" on it (or even Boise material with "Boise Building Solutions") would have created a biased, unobjective survey.

Mr. Weilbacher's approach was appropriate given the market context. This is not a case where consumers are confronted with two competing brands on a shelf, each with a similar name. Boise does not use its business unit name "Boise Building Solutions" on its products and CertainTeed does not put "building solutions" on any of products. Further, neither party maintains retail stores. Also, buyers for Boise's products are buyers from lumberyards and retail

establishments, which most likely would order by telephone. Accordingly, there is nothing unreasonable or improper about Mr. Weilbacher using a telephone approach, and not sending materials to the participants (which likely would have biased the survey).

The case citations do not support the claim that Mr. Weilbacher's testimony should be excluded because he designed a telephone survey. As discussed above, the Court in *J & J* criticized plaintiff's survey primarily because it was directed at persons who had no exposure to the trademark. 220 F.Supp.2d at 371. Mr. Weilbacher did the opposite – he tried to identify persons who might know of CertainTeed's use of "Building Solutions."

The *Inc. Publishing Corp. v. Manhattan Magazine, inc.,* 616 F.Supp. 370 (S.D. N.Y. 1985) decision also does not help CertainTeed. In *Inc.,* the court held that defendant's use of "Manhattan inc." for a magazine did not infringe plaintiff's registered trademark for "Inc." for business magazines. In so holding, the court rejected defendant's request that plaintiff's survey evidence be barred:

> [T]he defendants at bar objected strenuously to the admission into evidence of [plaintiff's] survey. However, I agree with Judge Glasser in *Toys R Us, Inc.,* [559 F.Supp. 1189 (E.D. N.Y. 1983)] that in a non-jury trial, the better course is to 'receive the evidence and then ignore it or give it such weight as the court [thinks] appropriate.' *Id.* at 1202. That is the course I have followed in this case.

616 F.Supp. at 390.

The court then went on to consider plaintiff's survey offered to establish likelihood of confusion. Plaintiff's survey consisted of calling randomly selected subscribers to Inc. Magazine, reading them the names of five business magazines: *Business Week, Fortune, Inc., Money and Manhattan inc.* and the asking them, among other things, "Do any of the magazines I just mentioned sound as if they might have the same publisher?" 616 F.Supp. at 391. Other questions included whether the magazines "sound" as if they "might contain similar types of

articles and information," and whether "Manhattan inc. magazine might be a regional version of inc. Magazine?" *Id.*

The court criticized the survey on various grounds, including that a survey of plaintiff's subscribers would likely be biased toward plaintiff and that the use of the word "might" in the questions would lead to too many affirmative responses. 616 F.Supp. at 393. The court also noted, however, that the survey would have been more effective if the magazines had been in front of the participants. *Id.*

The *Inc.* reasoning does not support the exclusion of Mr. Weilbacher's testimony. The reasoning suggests, again, that Mr. Weilbacher's survey was biased toward CertainTeed because it attempted to identify persons who would be CertainTeed customers. Second, there are no products with "CertainTeed Building Solutions" or "Boise Building Solutions" that could be shown to a survey participant. Given the nature of Boise's and CertainTeed's businesses, a telephone survey was the most objective manner in which to proceed.

CertainTeed's reliance on *The Upjohn Co. v. American Home Prods. Corp.,* No. 1:95:CV:237, 1996 U.S. Dist. LEXIS 8049 (E.D. Mich. Apr. 5, 1996), is also misplaced. In *Upjohn*, the court rejected a contention that a telephone survey should not be admitted. *See id.* at *42 ("The objection goes to the weight of the survey results.").

## F.    There Is No Lack of Raw Data

CertainTeed's last complaint is that the report does not "include any of the underlying raw data, precluding any independent review and rendering it inadmissible." Motion at 11, citing *Upsher-Smith Labs. v. Nylam Labs., Inc.*, 944 F.Supp. 1411, 1413 (D. Minn. 1996). Tellingly, CertainTeed does not claim that it does not have access to the raw data; only that the raw data was not included *with the report*. In fact, Boise is in the process of producing the raw data to CertainTeed, in connection with the deposition that CertainTeed will be taking of Mr. Weilbacher. This satisfies any legitimate concerns CertainTeed may have regarding access to the raw data. The *Upsher-Smith* decision provides no support for CertainTeed on this issue. That

case did not involve any trademark claims, much less have anything to do with a trademark survey.  The decision certainly does not support the exclusion of Mr. Weilbacher's survey or testimony.

## IV.    CONCLUSION

For the reasons set forth above, CertainTeed's motion to exclude the testimony and expert report of William Weilbacher should be denied.

RESPECTFULLY SUBMITTED this 27th day of May, 2003.

David L. Grove (Pa. ID No. 14264)
James D. Cashel (Pa. I.D. No. 72056)
Montgomery McCracken Walker
   & Rhoads LLP
123 S. Broad St.
Philadelphia, PA  19109
(215) 772-1500

and

Ramsey M. Al-Salam
William D. Fisher
PERKINS COIE LLP
1201 Third Avenue, Ste. 4800
Seattle, WA  98101
(206) 583-8888

Jeffrey D. Neumeyer
BOISE CASCADE CORPORATION
1111 West Jefferson Street
P.O. Box 50
Boise, ID  83728
(208) 384-7460

Attorneys for Defendant Boise Cascade Corporation

# EXHIBIT 1

# OUR NEWEST BUILDING PRODUCT WILL HELP YOU BUILD

# YOUR BUSINESS.




## WHERE DO YOU SEE YOUR BUSINESS GROWING?

Higher sales? Better profit margins? Deeper customer relationships? Wouldn't it be great to have a roadmap to make sure you're going down the right highway?

Introducing the Boise engineered wood products business planning process, to help you decide where you want your business to go. From Boise, your partner in profitability. Anybody can deliver an I-joist. Today, what's important is a business relationship that helps you get where you want to go.

**The Boise Business Planning Process**

The Boise business planning process is unique in the industry. Working with your Boise people and data they've collected, you'll determine your ideal business plan and market niche. You'll have a list of prospects and ideas about how to get your foot in the door. Inventory levels will be optimized to have the right products on hand and save on interest costs. You'll hear about areas of your business that could be improved, and employee training and development to keep your people on the cutting edge.

Now's the time to get started. Call your Boise representative to begin putting the Boise business planning process to work for you. For a better tomorrow.

Analyze your market and determine how much of it you'd like to own.

## BOISE

Building Solutions
Engineered Wood Products

www.bcewp.com

For your nearest distributor, call 800-232-0788.

© 2002 Boise Cascade Corporation

BC 042833
CONFIDENTIAL

# BOISE

Building Solutions
Engineered Wood Products



# BOISE GLULAM™

## Product Guide

BC 012096

π EXHIBIT 18
ronemvCertainTeed
2-11-03 Rptr. AS
WWW.DEPOBOOK.COM

# THE STRONG, SILENT TYPE.

*Boise's Simple Framing System™ is stronger and more reliable than ordinary lumber. That makes for stable, quiet floors and true walls and ceilings. To learn how our family of BCI™ Joists, Versa-Rim™ and Versa-Lam™ products can build your reputation, see your building materials, dealer.*



# BOISE℠

## Building Solutions, Distribution

**Boise Distribution**
101 Prosperity Road SE
**Albuquerque, NM** 87105
505/877-8150
Fax 505/877-7916

**Boise Distribution**
P.O. Box 30437 (Zip 59107-0437)
1240 S. 29th Street West
**Billings, MT** 59102
406/652-3250
Fax 406/656-9969

**Boise Distribution**
P.O. Box 5797 (Zip 83705-0797)
4300 Enterprise
**Boise, ID** 83705-5421
208/384-7700
Fax 208/345-1517

**Boise Distribution**
P.O. Box 5767-TA (Zip 80217-5767)
1351 East 66th Avenue
**Denver, CO** 80229-7222
303/289-3271
Fax 303/288-0476

**Boise Distribution**
615 S. 15th Street
**Grand Junction, CO** 81501
970/244-8301
Fax 970/244-8316

**Boise Distribution**
P.O. Box 2107 (Zip 83403-2107)
3890 Bombardier Avenue
**Idaho Falls, ID** 83402-4302
208/522-6564
Fax 208/524-0308

**Boise Distribution**
P.O. Box 19009 (Zip 85005-9009)
200 South 35th Avenue
**Phoenix, AZ** 85009
602/269-6145
Fax 602/272-6484

**Boise Distribution**
P.O. Box 65458 (Zip 84165)
1020 West 3265 South
**Salt Lake City, UT** 84119
801/973-3943
Fax 801/972-1937

**Boise Distribution**
P.O. Box 13389 (Zip 99213-3389)
East 7020 Mission Avenue
**Spokane, WA** 99212
509/928-7650
Fax 509/922-0599

**Boise Distribution**
P.O. Box 369 (Zip 98666)
3309 NW Lower River Road
**Vancouver, WA** 98660
360/693-0057
Fax 360/693-1049

**Boise Distribution**
P.O. Box 168 (Zip 98072-0168)
8720 216th Street SE
**Woodinville, WA** 98072
425/486-7477
Fax 425/402-1291

**Boise Distribution**
P.O. Box 9877 (Zip 98909-0877)
1512 South First Street
**Yakima, WA** 98901
509/453-0305
Fax 509/453-5629

Circle No. 151 on p. 70

BC 033969

Δ π EXHIBIT 9
Deponent *CertainTeed*
Date 2-11-03 Rptr. AS
WWW.DEPOBOOK.COM

# *Honoring Our* WWII VETERANS







Boise, a **VETERAN** in **SUSTAINABLE FORESTRY**, salutes all veterans and especially those who served in WWII.

We take this opportunity to reflect and remember those whose spirit, sacrifice and commitment keep our nation safe and free.

**BOISE**℠

Building Solutions, Wood Products

www.bc.com



BC 038723

*Celebrating*

# EARTH DAY 2002



Boise's Certified Sustainable forest in Northeast Oregon

*and looking toward*



Our forests are
## CERTIFIED SUSTAINABLE.

Boise integrates the sustainable growing and
harvesting of trees with protection of wildlife, plants,
soil and water quality, all while providing the
renewable, recyclable wood products on which you
depend, today, tomorrow and far into the future.



Building Solutions, Wood Products

www.bc.com

BC 038722



# COMMON GROUND

### Common Concerns • Common Practices • Common Goals

## Environmental Stewardship

*Boise salutes agriculture stewardship and those who manage their lands on a sustainable basis, just as we do.*

*Boise integrates the sustainable growing and harvesting of trees with protection of wildlife, plants, soil and water quality. Our forests are certified sustainable!*

*"THANKS" to the hard working men and women of the agricultural industry.*



The pine marten is a species of interest & protected on Boise lands in NE Oregon.



Ponds on Boise lands provide water for fire protection, domestic livestock & wildlife.

30-year-old stand on Boise land in NE Oregon.

## BOISE

Building Solutions, Wood Products

www.bc.com

BC 038721



## *Proclamation*

**Declaring
Union County**

## APPRECIATION DAY

For

## BOISE CASCADE CORPORATION

### *Whereas:*

Boise is the largest private employer in Union County

Boise has continually upgraded its facilities

Boise has implemented environmentally sound practices

Boise's forests are certified sustainable

Boise contributes greatly to the quality of life in Union County.

*It is hereby resolved that April 25, 2002 is declared Appreciation Day For Boise Cascade Corporation*







Water saved here...
Water saved there...

**REALLY ADDS UP**

## We're Saving More Than
# 100 MILLION
## GALLONS OF WATER PER YEAR

 Our Recent Environmental Upgrades Include:
- BOILER WATER RECYCLING SYSTEMS
- ADVANCED STEAM CONTROL SYSTEMS
- NEW CLOSED-LOOP COOLING SYSTEMS

*Because conserving water is the right thing to do.*

# BOISE℠
Building Solutions, Wood Products

www.bc.com

BC 038725



Whether your habitat is constructed
of boards or branches, Boise is working
to provide you with the very best.

**BOISE**™

Building Solutions, Manufacturing

www.bc.com

BC 038726



BC 038727



**BOISE**℠

*honored to serve as a* *Community Partner*








*Our* *Mission* *in* *Northeast Oregon*

*As a community partner we continuously improve the Region's long-term value to customers, employees, shareholders and society. We are a preferred employer, an environmentally conscious, profitable forest products business.*

*Our northeast Oregon region is proud to employ approximately 850; nearly 20% of our work force is women, and we are pleased to provide a full benefit package and good wages. In 2001 our wage/benefit package totaled $36,548,265 with an average annual wage of $33,826 per employee.*

**BOISE**℠

Building Solutions, Wood Products

BC 038728



*Welcome* *to the* **FAIR**

*Investing in our sustainable forests*
*Investing in our manufacturing facilities*
*Investing in local communities*

In northeast Oregon, **BOISE** contributes to over 50 civic, educational and philanthropic organizations.

**BOISE** ℠

Building Solutions, Wood Products

www.bc.com

BC 038729

# It's a forest out there... in *Fact* it's a



# CERTIFIED, SUSTAINABLE FOREST



Boise's forests in Northeast Oregon are CERTIFIED to be in full conformance with American Forest & Paper Association's Sustainable Forest Initiative.



*Fact:*

**INDEPENDENT AUDIT** - Boise's NE Oregon forest practices were audited by the world-renown, independent accounting firm of PricewaterhouseCoopers LLP.

*Fact:*

**SUSTAINABILITY CERTIFIED** - PricewaterhouseCoopers LLP certified Boise's full conformance with American Forest & Paper Association's Sustainable Forest Initiative, principles that integrate the sustainable growing & harvesting of trees with protection of wildlife, plants, soil & water quality.

*Fact:*

**TECHNICAL EXPERTISE** - The audit team included experts in wildlife & range management, forest engineering & planning, and silviculture, the science of growing trees.

*Fact:*

**GOOD MANAGEMENT PRACTICES** - The audit reported numerous examples of Boise's exemplary management practices.

*Fact:* **We Are Very Proud Of Our Forests.**

# BOISE℠

. Building Solutions, Wood Products

www.bc.com

BC 038730

# PENDLETON ROUNDUP

# TRADITION

## Since 1910

# BOISE'S TRADITION

in Northeast Oregon

In addition to Boise's tradition of investing in local
communities, we are proud of our tradition of
**GOOD FOREST STEWARDSHIP.**
Our forests are
**CERTIFIED SUSTAINABLE**
by independent third-party audit and
conform to the Sustainable Forest Initiative
principles, integrating the sustainable growing
and harvesting of trees with protection of
wildlife, plants, soil & water quality.



Boise's 305,000 acre
CERTIFIED SUSTAINABLE forest
in NE Oregon is backed by the
Wallowa Mountains.

Each year these forests produce
enough timber on a sustainable
basis to build 3,000
average-sized homes and a
variety of other wood products.



Building Solutions, Wood Products

www.bc.com

BC 038731



*Welcome to the Miners' Jubilee*

*Investing in our sustainable forests*
*Investing in our manufacturing facilities*
*Investing in local communities*

In northeast Oregon, **BOISE** contributes to over 50 civic, educational and philanthropic organizations.

# BOISE℠

Building Solutions, Wood Products

www.bc.com

BC 038732



**Enjoy** YOUR VISIT TO OUR FOREST

And...

**Thanks**

For Being **Responsible Guests**

The Wallowa Mountains provide a spectacular backdrop for Boise's productive 560,000 acre forest in NE Oregon. Each year this forest produces enough timber on a sustainable basis to build 6,000 average-sized homes and a variety of other paper and wood products.

---

Due to **EXTREME FIRE DANGER** Boise may limit public access, campfires, and firewood cutting. Call 541-962-2045 for current information.

### HERE ARE A FEW THINGS YOU CAN DO TO HELP:

**Rules Of The Road...** Respect the Noregaard, Shamrock, and Catherine Creek travel restrictions and drive only on roads designated as open within those areas. The Noregaard travel restriction is in effect from Aug. 21-Nov. 25, 2002; Shamrock from Aug. 1-Dec. 9, 2002; and Catherine Creek from Aug. 21, 2002-June15, 2003. Maps are available at the Oregon Dept. of Fish & Wildlife at 65495 Alder Slope Rd., Enterprise, or 107 20th, La Grande.

**Cleanliness is next to...** Leave a clean camp and pack out all garbage.

**Don't Cut 'Em...** Standing dead trees are important habitat for non-game species like woodpeckers and owls, so please don't cut them!

**Get the Info...** Help us collect data. Bird hunters should place bird wings in collection barrels. Big game hunters should stop by the Oregon Department of Fish & Wildlife for collection bags in which to place samples.

**Weeds...Yuck...** We're working to control noxious weeds on our properties, so use only certified weed-free hay.

**It's A Forest Out There...** Drive safely and don't block gates or roadways. Remember that our forests are working timberlands and you may encounter a 40-ton truck hauling logs to one of our mills.

---

Have A Great Hunt!



Building Solutions, Wood Products

www.bc.com

BC 038733

# INVESTING IN THE FUTURE

## Boise's 2002
## SCHOLARSHIP RECIPIENTS



**JESSICA DOWDY**
Linfield College
Daughter of
Steve [LG Sawmill]
& Teresa Dowdy



**SKIP HINTON**
Central Oregon CC
Son of David
[LG Sawmill] &
Pat Hinton



**KYLEE GRESHAM**
Elgin HS
Daughter of
Steven [Studmill]
& Kanda Gresham



**KERI RANFT**
Horseshoe Bend HS
Daughter of
William [BMOD-Boise]
& Kelly [Riverbend
Mfg] Ranft



**SHAE PRINCE**
Union HS
Son of
Darwin [Particleboard]
& Ronetta Prince



**KACIE MCDONALD**
Elgin HS
Daughter of
Tom [Plywood]
& Sheri McDonald



**RETHA SHIRLEY**
Oregon Inst. of Tech.
Daughter of
Larry [LG Log Yard]
& Linda Shirley



**LARINDA PORATH**
New Plymouth HS
Daughter of
Royce Porath
[Idaho Specialties]



**JORDAN SPIKES**
Oregon State U.
Son of
Rod [Studmill] &
Evelyn Spikes



**TYLER DAVIS**
Elgin HS
Son of
James [Particleboard]
& Pamela Davis



**STEPHEN MANDZAK**
Carnegie Mellon U.
Son of
John [Timberlands]
& Patricia Mandzak



**SHERI RYSDAM**
Eastern Oregon U.
Daughter of
Douglas [Elgin PW]
& Cecilia Rysdam

At Boise, we know the importance of
**INVESTING IN THE COMMUNITY**
**INVESTING IN THE ENVIRONMENT**
**INVESTING IN THE FUTURE.**
We are pleased to award scholarships totaling $5,900 to these
**FUTURE STARS OF LEADERSHIP.**



## BOISE
Building Solutions, Wood Products

www.bc.com



BC 038734



*Shriners 50 year*

# TRADITION

*East-West Game*

## BOISE'S TRADITION
in Northeast Oregon



In addition to Boise's tradition of investing in local communities, we are proud of our tradition of GOOD FOREST STEWARDSHIP. Our forests are CERTIFIED SUSTAINABLE by independent third-party audit and conform to the Sustainable Forest Initiative principles, integrating the sustainable growing and harvesting of trees with protection of wildlife, plants, soil & water quality.

Boise's 305,000 acre CERTIFIED SUSTAINABLE forest in NE Oregon is backed by the Wallowa Mountains.

Each year these forests produce enough timber to build 3,000 average-sized homes and a variety of other wood products.



Building Solutions, Wood Products

www.bc.com

BC 038735





**ADMINISTRATIVE and TIMBERLANDS.** *Located in the Regional office at 1917 Jackson, La Grande.*

**PARTICLEBOARD PLANT.** *Our high-quality particleboard is used to manufacture TV cabinets, office and kitchen cabinetry, and construction materials such as shelving, counter tops and stepping.*

**ELGIN COMPLEX.** *The high-end plywood produced at Elgin is used in home construction. The Premium Cut 2x4 made at the Elgin Studmill is sold to The Home Depot.*

**LA GRANDE SAWMILL.** *The sawmill's value-added lumber is used to make door and window moldings. Our primary customers are window manufacturers such as Pella and Marvin and businesses that produce components for them.*



# BOISE. Investing in our sustainable forests, Investing in our manufacturing facilities, Investing in local communities

## BOISE AT WORK IN OREGON

**SUSTAINABILITY CERTIFIED** - The Wallowa Mountains provide a spectacular backdrop for Boise's production 305,000 acre forest in NE Oregon. Boise is a leader in sustainable forestry, and each year the company's forest in NE Oregon produces enough timber on a sustainable basis to build 3,000 average sized homes and a variety of other paper and wood products.

1925 Mount Emily Lumber sawed its first log in La Grande

1957 Boise Payette and Cascade Lumber companies merged to form Boise Cascade

1961 Purchased the Western Studmill in Elgin

1964 Plywood Plant, Elgin opened

1966 Particleboard Plant, Island City start-up

1971 Second production line added at Particleboard Plant

2002 Currently - 305,000 acres of timberlands, Elgin Plywood and Studmill facilities, the Particleboard Plant and Sawmill complex in La Grande, providing approximately 800 Family-Wage jobs

## BOISE

Building Solutions, Wood Products

www.bc.com

BC 038736



Good Luck ATHLETES

BOISE'S TRADITION
in Northeast Oregon

In addition to Boise's tradition of investing in local communities, we are proud of our tradition of GOOD FOREST STEWARDSHIP.

Our forests are CERTIFIED SUSTAINABLE by independent third-party audit and conform to the Sustainable Forest Initiative principles, integrating the sustainable growing and harvesting of trees with protection of wildlife, plants, soil & water quality.

Boise's 305,000 acre-CERTIFIED SUSTAINABLE forest in NE Oregon is backed by the Wallowa Mountains.

Each year these forests produce enough timber to build 13,000 average-sized homes and a variety of other wood products.



BOISE℠

Building Solutions, Wood Products

www.bc.com

BC 038737

# Hey Kids!

## "WOOD" YOU BELIEVE...

There are more than 5,000 things made from trees.

Have fun with these games and learn about our renewable forests and recyclable wood products.



Forests grow in all areas of the U.S. If these trees were put together limb to limb, they would take up a space equivalent to one third of the country.



**33% FOREST LAND**

## True or False?

|  | T/F |
|---|---|
| 1. More paper is recycled in the U.S. then is sent to landfills. | ☐ |
| 2. There are more trees in the U.S. today than there were 75 years ago. | ☐ |
| 3. Ice cream, shampoo and toothpaste all contain a wood fiber called cellulose. | ☐ |
| 4. Rayon, a fabric used in today's clothes, is made from wood. | ☐ |
| 5. Almost a third of the world's total land area is covered by forests. | ☐ |
| 6. The forest industry in America plants more trees in the forest than any other entity. | ☐ |

ANSWERS: The answer to each of the above is : true!

## Draw a line to complete the statement.

| 1. The number of seedlings planted each year is | A. provide wildlife habitat. |
|---|---|
| 2. Trees help our atmosphere by | B. the world's demand for paper is much larger than can be provided through recycling. Wood and other fibers must also be used to meet the remaining demand. |
| 3. Forests not only provide wood for the products you use every day, they also | |
| 4. We can't make all the paper we use from recycled material because | C. 1.5 Billion. |
| | D. consuming carbon dioxide and releasing oxygen. |

ANSWERS: 1-C, 2-D, 3-A, 4-B

## DID YOU EVER STOP TO THINK...

...HOW IMPORTANT PAPER IS? WHAT WOULD WE DO WITHOUT IT? JUST TAKE A LOOK AROUND YOUR HOME AND CLASSROOM. HOW MANY THINGS CAN YOU FIND THAT ARE MADE OUT OF PAPER?

CAN YOU FIND THESE OBJECTS HIDDEN IN THE FOREST PICTURE BELOW? GUESS WHAT THEY ARE ALL MADE OUT OF PAPER.

KITE
PLAYING CARD
PARTY HAT
DOLLAR BILL

PARTY BAGS
TEA BAG
MASKING TAPE
SOAP BOXES
WORLD GLOBE

POSTAGE STAMP
GIFT BOW
NEWSPAPER
PAPER BAG
MILK CARTON

EGG CARTON
SHOE BOX
GREETING CARD
PAPER CUP
ENVELOPE



Thanks to TAPPI, Technical Association of the Pulp and Paper Industry for providing games and information.

## Word Search

DIRECTIONS: Find the list of forest related words in the grid of letters. Circle each of the words you find. Good luck!

- Paper
- Trees
- Nature
- Recycle
- Sustainable
- Pulp

```
C O S Y G O N R F M C
D P U L P B L E N D E
M Y S F O Z H C W I Q
O N T Q A F E Y O N L
B E A Z F G B C B E H
L D J A E T I L Z D C
H X N A T U R E F W D
C M A I S J W E V S G
R B B T R P A P E R O
Z U L R A Z F G A S B
A N E U E I G F E W R
```

**BOISE**

Building Solutions, Wood Products

www.bc.com

BC 038738



BC 038739



While Enjoying Chief Joseph Days

TAKE THE TOUR

and take the whole family

Boise's

# SCENIC DRIVING TOUR and NATURE HIKE



TOUR ENTRANCE

To Lewiston, ID

To La Grande, OR   Lostine   Enterprise, OR

Joseph

Wallowa Lake

Pick up your copy of the Driving Tour and Nature Hike booklet at:

Wallowa County Chamber of Commerce 836 W. North St., Enterprise Phone 541-426-4622 Driving Tour Entrance Or Phone 541-962-2080

Take *THE FAMILY*
Take *THE TOUR*
and Take *YOUR BEST SHOT*

Pack up the family, a picnic and your camera. Enjoy a beautiful drive and nature hike through Boise's working forest in northeast Oregon.

You'll view gorgeous wildflowers, many species of birds and wildlife and learn how Boise integrates the sustainable growing and harvesting of trees with protection of wildlife, plants, soil and water quality.

*Our Forests Are*
*CERTIFIED SUSTAINABLE*



# BOISE℠

Building Solutions, Wood Products

BC 038740

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CERTAINTEED CORPORATION,　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　)　　Civil Action No. 02-2677
　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　)　　Hon. William H. Yohn
　　　　　　　　　　　　　　　　　)
BOISE CASCADE CORPORATION,　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)
_____)

# EXPERT REPORT OF WILLIAM M. WEILBACHER

## April 22, 2003

<u>Statement of William M. Weilbacher, Expert Witness For</u>

<u>The Defendant In CERTAINTEED CORPORATION v. BOISE CASCADE</u>

<u>CORPORATION.</u>

I. I am President of Bismark Advertising, Inc., a

Massachusetts Corporation d/b/a Bismark Coporation,

located at 30 Bismark Way in Dennis, MA, 02638.

II. In connection with this litigation I have conducted a

study entitled <u>"Certainteed/Boise Cascade "Building</u>

<u>Solutions" Confusion Study In Ten Metroplitan Areas."</u>

dated April 2003. The results of this study appear in

the attached report.

III. My work history, academic training, graduate schoool

teaching, and publications are summarized in the documents

appended to this statement as Section B.

IV. My litigation experience is summarized in appended

Section C.

V. I am compensated at the rate of $300 per hour for all work

connected with this expert witness asssignment. In

addition, I am to be reimbursed for the field work

Weilbacher Statement - 1

BISMARK

costs associated with my study and other out-of-pocket expenses.

VI. I was retained by Ramsey M. Al-Salam of the Perkins Coie firm to work on this assignment on February 11, 2003.

_April 22, 2003_
_____
Date

_William M. Weilbacher_
_____
William M. Weilbacher

Weilbacher Statement - 2

BISMARK

Section B

WILLIAM M. WEILBACHER
30 Bismark Way, Box 2002
Dennis, MA 02638
508-385-6889    212-861-3944
Fax 508-385-6214

BISMARK CORPORATION (Marketing/Advertising Consulting)

1979 to present - President and owner

Recent clients include:

    The Hartford
    Serta, Inc.
    Mercedes-Benz USA
    Merrill Lynch
    Hasbro, Inc.
    JP Morgan Chase
    Warner-Lambert Company

DANCER FITZGERALD SAMPLE, INC.    (Advertising Agency)

1971-1979 - Vice Chairman (1974-79)
            Executive Vice President (1973-74)
            Senior Vice President (1971-73)
            Director (1972-79)

1956-1962 - Vice President, Director of Research

    Account Management Director: (1971-79)

    Sterling Drug (Bayer Aspirin, Bayer Children's Aspirin,
            Bayer Timed Release Aspirin, Phillip's
            Milk of Magnesia; New Products.)

    Lanvin Charles of the Ritz (Fragrances and Cosmetics)

    Richardson-Vick, Inc. (New Products)

    P&L responsibility; final responsibility for advertising
    strategy, planning and execution; marketing planning;
    creative strategy development; television planning,
    network negotiation, network copy clearance.

    Administrative Director - Media, Research and Promotion
    Services Departments): (1974-1979)

    Responsible for departmental policy; departmental
    standards; goal setting; personnel; budgeting; cost
    control.

-1-

President, CEO, DFS Holdings, Inc.: (1974-79)
Responsible for DFS diversification activities;
acquisition identification; appraisal; negotiation.

President, CEO, Program Syndication Services: (1976-79)

P&L responsibility for televison timebank and syndicated
programming subsidiary.

## J. WALTER THOMPSON COMPANY (Advertising Agency)

1969-1970 - Vice President and Director of Research

Reorganized and redirected JWT research services and
activities.

## JACK TINKER AND PARTNERS (Advertising Agency subsidiary of The Interpublic Group of Companies)

1966-69 - Partner, Account Management Director

Miles Laboratories (Alka Seltzer, Chocks Vitamins, One-A-Day
                     Vitamins, Nervine, New Products.)

P&L responsibility; final responsibility for advertising
strategy, planning and execution.

## McCAFFREY AND McCALL (Advertising Agency)

1962-1966 - Senior Vice President

Director of Media, Research and Sales Promotion

Chairman, Strategy Review Board

## EDUCATION:

Yale University, B.S.
Graduate School of Business, Columbia University, M.S.

## PUBLICATIONS:

Brand Marketing, NTC Business Books, 1993

Advertising (An introductory text), The Macmillan

-2

Publishing Company, 1979; Second Edition, 1984.

Marketing Management Cases, The Macmillan Publishing Company, 1970. Subsequent editions in 1975, 1980 and 1986.

Cases In Advertising, The Macmillan Publishing Company, 1981.

Auditing Productivity - Advertiser/Agency Relations Can Be Improved, Association of National Advertisers, Inc., 1981. Second Edition entitled Managing Agency Relations, 1991.

Current Advertiser Practices in Compensating Their Advertising Agencies, Association of National Advertisers, Inc., 1983, 1986, 1989, 1992 and 1995.

Choosing An Advertising Agency, Crain Books, 1983. Second Edition entitled Choosing and Working With Your Advertising Agency, NTC Business Books, 1991.

Advertising In America: The Consumer View, Harvard University Press, 1968. (In collaboration with Raymond A. Bauer and Stephen A. Greyser).

Marketing Research: Readings and Analytic Commentaries, The Ronald Press Company, 1966. (With Hiram C. Barksdale).

Advertising Media, The Ronald Press Company, 1959. (With Lyndon O. Brown and Richard S. Lessler).

Articles in the Public Opinion Quarterly (1970); Journal of Marketing (1951, 1967); Journal of Advertising Research (1962, 2002); Marketing Handbook (1965); International Journal of Advertising (1988); The Advertiser (1995).

Member of the Advisory Board of the ENCYCLOPEDIA OF ADVERTISING (2002). Contributed articles:"Brands"; "Fee Method of Agency Compensation"; "Commission Method of Agency Compensation".

## MARKETING AND ADVERTISING EDUCATOR:

Adjunct Professor of Marketing, Graduate School of Business, Columbia University - 1958-1964; 1976; 1980-81.

Adjunct Professor of Marketing, Graduate School of Business, New York University - 1966-1970; 1982; 1983; 1985; 1988.

Visiting Professor of Advertising, S.I. Newhouse School of Public Communications, Syracuse University - 1983-86.

-3

Section C

Weilbacher Deposition Testimony:

1. American Home Products v. Abbott Laboratories
   Southern District of New York, Judge Sofaer, 8/81

2. Coca-Cola v. Tropicana
   Southern District of New York, Judge Carter, 4/82

3. Certain Vacuum Bottles and Components Thereof
   United States International Trade Commission,
   Judge Duvall, 5/82

4. Ciba-Geigy v. Shering Plough Corp.
   Southern District of New York, Judge Walker, 8/87

5. U.S. Healthcare et al v. Blue Cross of Greater
   Philadelphia
   Eastern District of Pennsylvania, Judge Katz,
   12/87

6. General Mills v. Kellogg
   District of Minnesota, Third Division, Judge
   Magnuson, 9/88

7. Wallace Buiness Forms v. Sun Microsystems
   Northern District of Illinois, Eastern Division,
   Judge Hart, 11/88

8. Sands Taylor v. Quaker Oats
   Northern District of Illinois, Eastern Division,
   Judge Marshall, 9/89

9. Continental Airlines v. United Airlines Central
   District of California, Judge Rafeedie, 10/89

10. Weight Watchers International v. Stouffer Foods
    Corporation Southern District of New York, Judge
    Mukasey, 2/90

11. Sears, Roebuck and Company v. Sears Realty Co., Inc.
    Northern District of New York, Judge Munson, 4/90

12. Girl Scouts/Boy Scouts of America v. The Bantam
    Dell Publishing Group Southern District of New
    York, 1/91

13. J&J v. SmithKline Southern District of New York,
    5/91

14. RE/MAX v. Help-U-Sell Central District of California,
    Judge Kenyon, 6/91.

- 1

BISMARK

15. <u>Bally Schuhfabriken AG v. Bally Inc.</u> Southern District of New York, 12/92.

16. <u>Hershey Foods Corporation v. Richardson Vicks, S.A. de C.V.</u> District Court of Ohio 2/93

17. <u>Express Inc. et al v. Sears Roebuck and Co.</u> Southern District of New York, 4/93.

18. <u>Commonwealth of Massachusetts v. Eggland's Best, Inc.</u> Commonwealth of Massachusetts Superior Court, 2/94.

19. <u>United Foods Inc. v. United Airlines, Inc., U.S.</u> Trademark Commission, 2/94

20. <u>Remax v. Century 21</u> Central District of California, 11-12/94

21. <u>Ringling Brothers-Barnum & Bailey Combined Shows, Inc. v. Utah Division of Travel Development</u>, 12/96

22. <u>Genesis Leverage Development Corporation v. Borden, Inc.</u> Federal District Court in Hartford, CT, 5/97

23. <u>Sirio Maccione v. Avon Products Corporation</u> Southern District of New York, 02/99

24. <u>Thomas & Betts Corporation et al v. Panduit Corporation</u> Northern District of Illinois, Eastern Division, 07/00

25. <u>Navigant International, Inc. v. Metzler Group, Inc.</u> Federal District Court in Denver, CO. 10/00

26. <u>Purebred Company, Inc. v. Star Kist Foods, Inc</u>, Federal District Court, Denver, CO 09/01

- 2

Weilbacher Trial Testimony:

1. <u>American Home Products v. Abbott Laboratories</u>
   Southern District of New York, Judge Sofaer, 8/81

   Testimony in behalf of Abbott regarding market
   research studies used by Abbott to substantiate
   advertising claims.

2. <u>Nabisco v. Tootsie Industries</u>
   Southern District of New York, Judge Pollack, 3/82

   Designed and conducted consumer survey and testified
   about it, in behalf of Nabisco. The survey established
   confusion between Nabisco and Tootsie Industries
   trademarks.

3. <u>Coca-Cola v. Tropicana</u>
   Southern District of New York, Judge Carter, 4/82

   Testimony for Coca-Cola in respect to Tropicana
   advertising that Coca-Cola believed to be false and
   misleading. Testimony based on third party consumer
   research.

4. <u>Personal Products Co. v. ICD</u>
   Eastern District of Philadelphia, Judge Newcomer,
   4/82

   Designed and conducted consumer survey and testified
   about it for Personal Products Co to determine whether
   or not confusion existed in consumer minds between
   Stay Free and competitive package designs.

5. <u>Fireworks Advertising v. Rossignol Ski Co. et al.</u>
   New York State Supreme Court, Judge Nadel, 5/82

   Testimony in behalf of Rossignol Ski Co. about trade
   practices in advertising agency-client relations.

6. <u>Certain Vacuum Bottles and Components Thereof</u>
   United States International Trade Commission,
   Judge Duvall, 5/82

-1-

Testimony in respect to trademark infringement based on similarity of Union Manufacturing Company's vacuum bottle shapes and those of various Korean and Taiwanese exporters.

7. <u>Certain Vacuum Bottles and Components Thereof</u>
   Southern District of New York, Judge Sweet, 6/84

   Jury trial to determine whether the trademark of Union Manufacturing Company's vacuum bottle shapes had been infringed upon and, if so, to determine whether monetary damages should be awarded to Union Manufacturing Company.

8. <u>Thompson Medical v. Ciba Geigy</u>
   Southern District of New York, Judge Lowe, 11/85

   Testimony concerning alleged false and deceptive advertising by Thompson Medical Company.

9. <u>A.B.C. Sewer Cleaning Company v. The Bell Telephone Company of Pennsylvania, et al.</u>
   Court of Common Pleas, Philadelphia County, Judge Kremer, 12/85

   A.B.C. Sewer complained that Bell of Pennsylvania exercised monopoly power in business practices connected with the sale of Yellow Pages. Testimony concerning the relevant media market; competition in the Philadelphia media market; how advertisers choose among advertising media.

10. <u>Church & Dwight Co. Inc. v. Airwick Industries</u>
    Southern District of New York, Judge Walker, 5/86.

    Designed and conducted consumer survey concerning alleged false and deceptive advertising by Airwick Industries. Testified about the survey.

11. <u>Fruit of the Loom, Inc. v. Sara Lee Corporation</u>
    Southern District of New York, Judge Richard Owen, 4/87.

    Designed and conducted consumer survey concerning

-2-

alleged misleading and deceptive Hanes underwear
(Sara Lee Corporation) advertising. Testified in
behalf of Fruit of the Loom, Inc. about the
survey.

12. <u>Sands, Taylor & Wood v. Quaker Oats Company</u>
Northern District of Illinois, Eastern Division,
Judge Prentice Marshall, 9/89

Designed and conducted consumer research studies in
behalf of Sands, Taylor to determine confusion, if
any, between Thirst Aid and Gatorade.

13. <u>Weight Watchers International v. Stouffer Foods</u>
<u>Corporation</u>
Southern District of New York, Judge Mukasey
2/90

Designed and conducted consumer research in behalf of
Weight Watchers to determine meaning of certain Lean
Cuisine advertisements.

14. <u>Sears, Roebuck and Company v. Sears Realty Co. Inc.</u>
Northern District of New York, Judge Howard G.
Munson. 8/90

Designed and conducted consumer research in behalf of
Sears, Roebuck and Company to determine whether
confusion existed in the minds of consumers between
Sears, Roebuck and Company and affiliates of Sears
Realty Co., Inc.

15. <u>Re/Max International, Inc. v. Help-U-Sell, Inc.</u>
Central District of California, Judge David V.
Kenyon. 8/91

Designed and conducted consumer research in behalf of
Re/Max International to determine whether confusion
existed in the minds of consumers between Re/Max and
Help-U-Sell signage, and to determine whether
secondary meaning has developed in the minds of
consumers in connection with Re/Max signage. Testimony
by affidavit.

-3-

16. <u>Genesis Leverage Development Corporation v. Borden, Inc.</u> Federal District Court in Harford, CT, Judge Alfred Covello. 5/97

    Testified as a marketing expert in connection with the uniqueness of a flavored milk product for children. The case involved an allegation that Borden had stolen certain marketing and promotional ideas from Genesis Development Corporation, thus violating a confidentiality agreement signed by Borden.

17. <u>Purebred Company, Inc. v. StarKist Foods, Inc.</u>, Federal District Court, Denver, CO, Judge Wiley Daniel, 09/13/02

    Testimony as a consumer research expert in behalf of StarKist Foods, Inc. Evaluated an In-store Shopping Study and a Consumer Interview Study that had been conducted in behalf of Purebred Company, Inc.

-4-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of May, 2003, I served a true and correct copy of the foregoing DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE THE PROPOSED TESTIMONY AND EXPERT REPORT OF WILLIAM WEILBACHER (and proposed form of Order) on the following:

Roberta Jacobs-Meadway
Lynn Rzonca
Richard Peirce
BALLARD SPAHR ANDREWS &
    INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Fax: 215/864-8999

☒ U.S. Mail, Postage Prepaid
❑ Hand Delivery
❑ Overnight Mail
❑ Facsimile

Bruce P. Keller
DEBEVOISE & PLIMPTON
919 Third Avenue
New York, NY 10022
Fax: 212/909-6836

☒ U.S. Mail, Postage Prepaid
❑ Hand Delivery
❑ Overnight Mail
❑ Facsimile

James D. Cashel