**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CERTAINTEED CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civ. Action No. 02-2677** |
| **v.** | ) | |
| | ) | **Hon. William H. Yohn** |
| **BOISE CASCADE CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

It is hereby ORDERED that Plaintiff's Motion to Preclude the Expert Report and Proposed

Testimony of William Weilbacher is GRANTED and Defendant is precluded from offering at

trial, referring to, or relying upon the report of Mr. Weilbacher or the testimony of Mr.

Weilbacher.

BY THE COURT:

_____

YOHN, J.

Dated this _____ day of _____, 2003.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CERTAINTEED CORPORATION,    )
                                    )
            Plaintiff,      )
                                    )
v.                                  )
                                    )
BOISE CASCADE CORPORATION,   )
                                    )
            Defendant.     )

Civ. Action No. 02-2677
Hon. William H. Yohn

PLAINTIFF'S RESPONSE TO
OPPOSITION TO PRECLUDE THE PROPOSED TESTIMONY AND EXPERT REPORT OF
WILLIAM WEILBACHER

Defendant seeks to offer the Report and testimony of Mr. William Weilbacher regarding the results of his trademark "survey." Because the Weilbacher survey is fatally flawed, Plaintiff has moved to preclude the Report and proposed testimony.

Defendant's response to the motion to preclude is to repeat a refrain: "The flaws go to weight, not admissibility." That is precisely the approach the U.S. Supreme Court rejected in Daubert and Kumho. By repeating the mantra of "weight, not admissibility," Defendant concedes the point—the many serious flaws in the Weilbacher survey so outweigh any marginal relevance that it must be precluded as a waste of time and as unreliable and improper expert testimony under Federal Rules of Evidence 402, 403, and 702. It is this Court's obligation under those Rules to exclude such evidence.

Plaintiff submits this brief Response to address misstatements in Defendant's Opposition.

## I. Defendant Ignores the Rule of *Daubert* and *Kumho*.

Defendant's primary response to the fatal flaws in the Weilbacher survey is that the flaws go to the weight of the evidence, not to its admissibility. Defendant's response completely ignores the Supreme Court's decisions in Daubert and Kumho,[1] which hold that the Court must function as a gatekeeper against the admission of irrelevant, unreliable, junk science. Although earlier cases apply the "weight, not admissibility" rule, Daubert and Kumho make clear that it is neither necessary nor appropriate for the Court to accept unreliable evidence, then afford it little or no weight. The better course is for the Court to preclude such evidence at the gate. Daubert and Kumho fully support precluding the Weilbacher survey as "junk."

## II. Misstatements About the Facts and the Law

Trying to recast the substandard Weilbacher survey as having some value to this case,

---

[1] See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-48 (1999).

Defendant resorts to misstatements, easily exposed, which cannot correct the failure of the survey to meet the standards of admissible expert testimony.

## A. Relevant Buyers and Lack of Market Context

Mr. Weilbacher chose to conduct his survey without showing respondents how the parties actually use the term BUILDING SOLUTIONS in the marketplace. Instead of providing respondents with readily available samples showing use, Mr. Weilbacher conducted a telephonic memory-test. Defendant tries to explain away the flaw, saying market context is irrelevant:

> [Defendant] does not use its business unit name "Boise Building Solutions" on its products and [Plaintiff] does not put "Building Solutions" on any of [sic, its] products...buyers for [Defendant's] products are buyers from lumberyards and retail establishments, which most likely would order by telephone.[2]

First, to the extent this statement implies there was nothing to show respondents, that is of course not true. Both parties are currently using the term BUILDING SOLUTIONS on marketing materials. Contrary to Defendant's statement on page 4 of its brief that it is not using the term to promote its products, we attach a copy of one of Defendant's ads for its HOME PLATE products—products directly competitive with Plaintiff's siding products—that shows prominent use of A BOISE BUILDING SOLUTION. See Ex. 1.

Second, Defendant's statements about the buyers for its products contradict statements made by another of its experts, Mr. Pokotilow. He claims that Defendant markets its products to an audience different from that identified by Mr. Weilbacher: "original equipment manufacturers, wholesale distributors, and 'big box' retailers."[3] Obviously, each of these individuals has an incomplete understanding of the facts that renders his testimony valueless. And not only is Mr. Weilbacher's selection of the survey universe flawed, so is his execution. He surveyed respondents that are not part of either parties' relevant market, including a concrete

---

[2] Opp'n at 16-17.
[3] Pokotilow Report at 25, excerpt attached as Ex. 2.

contractor and an asphalt paving company.

Third, it is pure speculation by Defendant that most orders are placed by phone:

- There is no indication that any phone orders that may be placed would not be made by a buyer holding or looking at either parties' sales material or information about a past order;
- Defendant has sales representatives who call on customers *in person*;
- Defendant accepts orders via its Internet website; and
- There is no indication that any significant sales are booked by phone.

Moreover, as discussed *infra*, contrary to Defendant's claims that the survey was "biased in favor of Plaintiff," the failure to provide respondents with any market context simply created confusion for respondents who work from visual material when they choose and buy products at issue. Mr. Weilbacher's decision to omit evidence of marketplace use and instead ask respondents questions in a vacuum—including asking *Have you ever heard of Building Solutions,*[4] without ever even explaining that it is a phrase—renders the responses worthless and the Report inadmissible. Moreover, failure to show any marketplace material and asking about an affiliation between Plaintiff and Defendant to respondents who don't know about Defendant's use can yield no meaningful response.

In sum, the failure to provide respondents with any marketplace context as to actual use of the term BUILDING SOLUTIONS renders the survey unreliable and properly excluded.

## B. Courts Have Properly Criticized Mr. Weilbacher's "Surveys"

Defendant implies that because Mr. Weilbacher is "a recognized expert in trademark surveys,"[5] this Court should unquestioningly accept Mr. Weilbacher's flawed survey. That is untrue; other courts have also found flaws in Mr. Weilbacher's surveys similar to those in this case. For example, in Weight Watchers Int'l, Inc. v. Stouffer Corp., the court accorded Mr.

---

[4] Survey question 4a.
[5] Opp'n at 2.

Weilbacher's surveys very little weight "with strong misgivings about its improper universe and improper miscategorization of responses."[6] The court held that Mr. Weilbacher's surveys improperly failed to limit the universe to potential consumers, and his "[s]loppy execution of the survey broadened the universe further when interviewers mistakenly including participants who did not qualify even under Weilbacher's standards."[7] The court also rejected Mr. Weilbacher's conclusion that 13.2 percent of the survey respondents saw a connection between the parties. The court examined the actual responses and found they differed from Mr. Weilbacher's description. The Court did not consider the surveys.[8]

Although Mr. Weilbacher may have some general expertise, that is no reason for this Court to accept a flawed survey. If surveys are flawed, courts will reject them regardless of whether their designers generally qualify as "experts." For example, in J&J Snack Foods, Corp. v. Earthgrains Co.,[9] the court held that although the expert's qualifications were not an issue, his survey suffered from substantial flaws and was thus unreliable and inadmissible under Rule 702. Similarly, in Pep Boys Manny, Moe & Jack v. Goodyear Tire & Rubber Co.,[10] the court rejected a flawed survey even though it was conducted by a qualified market research expert. Thus, the relevant issue is not whether or not Mr. Weilbacher has any general expertise, it is whether the specific survey he conducted here satisfies the Federal Rules of Evidence and the U.S. Supreme Court's and Third Circuit's test for acceptable, admissible expert testimony. It does not.

### C. The Survey Results Are Meaningless And Do Not "Favor" Plaintiff

Another common refrain in Defendant's Opposition is that the survey is "biased toward Plaintiff." This is untrue; the flaws in the survey generated results that are meaningless. For

---

[6]  744 F. Supp. 1259, 1272 (S.D.N.Y. 1990).
[7]  Id. at 1272-73.
[8]  Id. at 1273-74.
[9]  220 F. Supp. 2d 358, 368-72 (D.N.J. 2002).
[10]  Civ. A. No. 01-CV-5614, 2002 WL 524001, at *9,10 (E.D. Pa. April 5, 2002).

example, the failure to provide respondents with any market context or material showing the parties' actual use of the mark prevented respondents from assessing what the parties' real-world audience sees. The object of a proper survey is to gauge real responses of real customers and extrapolate the results. It thus requires using the "real thing" in the survey. Courts have rejected surveys that fail to show respondents samples of how marks are actually used in the marketplace.

For example, in <u>Jaret Int'l Inc. v. Promotion in Motion Inc.,</u>[11] the court refused to admit the proposed survey because, *inter alia*, respondents were shown product packaging from which material had been cut out. In the same way, Mr. Weilbacher's failure to show samples of the parties' actual use produced meaningless—and inadmissible—results.

As with the failure to provide a market context, Mr. Weilbacher's question sequences work against, not for, Plaintiff. Question 4a asked respondents *Have you ever heard of building solutions*, without any context. Moreover, after question 4a, the survey never asked the respondent in what context or with whom the respondent associates the term BUILDING SOLUTIONS, if not with Plaintiff or Defendant. Thus, the respondent was never given a chance to respond as to what the term BUILDING SOLUTIONS means or with whom the respondent associates the term. It is certainly possible that the answer could relate back to Plaintiff or its program or another of Plaintiff's brands. The survey's failure to seek such additional information does not favor Plaintiff; it constitutes another fatal flaw.

### D. The Survey Was Neither "Scientific" Nor Reliable

Contrary to Defendant's claim that Mr. Weilbacher conducted a "scientific" survey, he did not. For a survey to be reliable it must meet the following criteria:

1. the universe must be properly defined;
2. a representative sample of such universe must be selected;

---

[11] 826 F. Supp. 69, 73-74 (E.D.N.Y. 1993).

3. the questions must be framed in a clear, precise and non-leading manner;

4. sound interview procedures must be used by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted;

5. the data gathered must be accurately reported;

6. the data must be analyzed in accordance with accepted statistical principles; and

7. the objectivity of the entire process must be assured.[12]

The Motion to Preclude establishes several ways in which the Weilbacher survey fails to meet these criteria. There are others. For example, recent production of Mr. Weilbacher's documents shows that he relied on survey questionnaires whose answers had been erased. Reliance on such results is unacceptable and suspect survey practice.

Yet another failure to meet the criteria of a reliable survey is the lack of question rotation. The survey questions were asked in this order:

> Have you ever heard of the document company?
> Have you ever heard of the passionate pursuit of perfection?
> Have you ever heard of building solutions?

Most respondents would thus have answered "No" twice before being asked about "building solutions." The failure to rotate questions inhibits recognition for the term BUILDING SOLUTIONS as a mark or name. Having answered as to lack of familiarity, a respondent is then discouraged from associating the term with any specific company. Having said "no" twice preconditions another "no" response for the Building Solutions question. A proper study would avoid such fatal design flaws.

Yet another example is the illogical question patterns. Respondents were never asked if they were familiar with either Plaintiff or Defendant. Nevertheless, Questions 5a and 6a asked if respondents had heard of the phrase Building Solutions in connection with Plaintiff or

---

[12]  See Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F.Supp. 1259, 1272 (S.D.N.Y. 1990); See also, Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc., 559 F.Supp. 1189, 1205 (E.D.N.Y. 1983) (applying factors and Rule 702 to exclude survey and opinions of experts which were based on survey).

Defendant. Question 7a then asked whether respondents thought Plaintiff and Defendant were related. But the survey failed ever to determine whether either or both companies were known to the respondent, or if so in what context. If the respondent was not familiar with either Plaintiff's or Defendant's use of BUILDING SOLUTIONS, there is no basis to ask about any relationship (and no meaning to any "yes" response about affiliation if there is no knowledge of either company or the use of BUILDING SOLUTIONS by Boise!). This illogical questioning resulted in confusion of respondents, skewing the survey and providing results that can mean nothing.

For all of these reasons, the Weilbacher study is neither scientific nor reliable. It is a collection of interviews resulting in at least double hearsay in response to a stimulus unconnected to market reality. It does not meet the relevant reliability standards and should be precluded.

### E. The Survey Does Not Address the Validity of the Mark

Yet another misstatement is the claim that the survey proves BUILDING SOLUTIONS is not recognized as Plaintiff's mark. The test for a valid mark is not whether the public can name the mark's owner. All that is required is that it be perceived as an indication that goods or services come from a single source. The identity of the source need not be known. 15 U.S.C. § 1127 (defining "trademark"). Tying the concept of a mark's validity to naming its owner (another improper survey question[13]) is legally incorrect, and yet one more example of the fatal flaws that infect the Weilbacher survey and render it inadmissible.

### III. Conclusion

The survey is fatally flawed, and Plaintiff respectfully requests that the Court preclude the testimony and report.

Respectfully submitted,

Roberta Jacobs-Meadway
Lynn Rzonca
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Dated: June 5, 2003

---

[13] Question 4b asked, "Do you associate a *particular company* or product with the phrase 'Building Solutions'?" A proper question is, "Do you associate *one company* with the phrase….?"

7

# EXHIBIT 1



HOME PLATE™
Siding



# Building Protection™

BC 047229

**BOISE**™

A Boise Building Solution



# I'm a builder.
# *I'm a homeowner.*

A home is a big investment for all of us. We dream about what it could be. We care about how it looks, how comfortable we are in our home, how well it's built and how well it will last.

## We *want to protect that investment.*

### What homeowners really want in a siding

> Low maintenance
> Real durability
> Great looks
> Value

### What builders really want in a siding

> Easy to work with
> Going on right the first time
> Handles tough job-site conditions
> Curb appeal
> Value

BC  047230

> ## Building Protection™

*HomePlate*™ Siding is the new standard for exterior protection. It's like armor plating for your home.

> ## Building Value

We all love the way the beauty of wood siding turns a house into a home. And we all know how much work it takes to keep it that way. Now imagine being able to achieve these great looks with a remarkably durable and low-maintenance siding solution. That's the promise of *HomePlate* Siding.

> ## Building Peace of Mind™

Just like *HomePlate* Siding protects your home, our warranty protects your investment. *HomePlate* Siding offers one of the most comprehensive limited warranties in the business, backed by Boise, a Fortune 500 company.

> ## Building the New Standard in Siding

Every siding manufacturer makes selective claims about the performance of their products. *HomePlate* surpasses their "standards" to set the new standard…all in one product.



BC  047231



# I *can* have all I want

What do you like about siding? What don't you like? We've spent years developing an exterior cladding system that sets the standard with all of the features you want without any of the problems.

BC  047232

# What is *HomePlate*™ Siding?

*HomePlate* Siding is an integrated wood-polymer building material. Our unique manufacturing process uses only high heat and pressure, without glues of any kind, to form an unbreakable combination of wood, for strength, and polymer, for durability. It creates an integrated material that is exceptionally moisture resistant, stable and strong.

Our manufacturing process represents the culmination of years of development, research and testing by Boise Building Solutions, producing a siding solution which exceeds current industry standards...and your expectations.



**700 PSI**

**420°F**

**700 PSI**



(A) *HomePlate* Siding    (B) Fiber Cement    (C) Vinyl



## I love the look of wood

We've captured the look and feel of natural cedar in *HomePlate* Siding. We produce 16' lengths to minimize the number of joints on your home, for better appearance and lower maintenance.

## I want a really strong product

*HomePlate* Siding is a full 7/16" thick. This gives your home a rich, substantial look. It also means that *HomePlate* Siding can shrug off stresses that give other manufacturers headaches. Flexible yet impact resistant, strong yet forgiving, *HomePlate* Siding keeps its great looks during construction and for the long haul.

## Everyone makes claims about performance

Some siding products are water resistant. Some are impact resistant. Still others claim rot and insect resistance. None, however, can combine all of these qualities—until now.

Unlike vinyl, *HomePlate* Siding combines a deep rich texture with superior impact resistance. Unlike fiber cement, *HomePlate* Siding does not retain water. Unlike wood-based composites, *HomePlate* Siding is not affected by moisture that causes composites to delaminate.

**So get what you really want—peace of mind. Peace of mind knowing that the way *HomePlate* Siding looks on the day it's installed is how it will look for years. Peace of mind that, as Boise Building Solutions, we stand behind our product and you with one of the most comprehensive limited warranties in the business.**

BC   047233

# Any siding looks good *on a sunny day…*

**HomePlate™ Siding stands up to workers, weather, insects, time and even your kids better than any other product on the market.**

### Is it wet out?

That doesn't affect the installation of *HomePlate* Siding.

### Complicated cuts at eaves or windows?

*HomePlate* Siding is remarkably forgiving and easy to work with.

### Did the kids throw a baseball at the house?

It'll just bounce off.

### Did you lend your neighbor your paintbrushes?

Don't worry, you won't need them back for a long time.
Paint will stay looking like new for years on *HomePlate* Siding.

## Here's proof

Independent tests prove that competitive materials absorb up to 96 times more water than *HomePlate* Siding.

*HomePlate* Siding resists water absorption dramatically better than other siding products. And that's just the beginning of our story of durability, low maintenance, weather resistance and great looks over the long haul.



Water absorption test results of *HomePlate* Siding versus competitive materials

Measurement of water absorption in 24 hours

| | | | | |
|---|---|---|---|---|
| 2.05 | 14.56 | 14.62 | 19.17 | 199.73 |

Siding Products

BC   047234



# Frequently Asked Questions

> **Does _HomePlate_™ Siding look like wood?**

We make _HomePlate_ Siding with the deep embossed texture of natural cedar. It's thicker than competitive products, creating a more dramatic shadow line between the boards, for a richer, more substantial look.

> **How does it handle in the field?**

Unlike competitive products, _HomePlate_ Siding is remarkably resilient in the field. It is not affected by moisture and does not lose its strength when wet, which means fewer delays for your installer. Impact resistant when installed, _HomePlate_ Siding is also tough when workers are installing it, meaning less waste.

> **Are any special tools required?**

If you know how to work with wood, you know how to work with _HomePlate_ Siding. No special and expensive tools are required, and _HomePlate_ Siding produces almost no dust when cutting. You'll be amazed how easily and well it cuts—it can't shatter.

> **What is the speed of installation of _HomePlate_ Siding relative to other siding products?**

Our feedback from builders indicates that _HomePlate_ Siding actually installs faster than fiber cement and vinyl and comparably to wood-based composites. Our longer 16' board lengths, shatter resistance, ease of handling and cutting, and exceptional water resistance means fewer boards to install, less weather delay and virtually no waste. That translates into a faster and more cost-effective installation.

> **How do I finish _HomePlate_ Siding?**

_HomePlate_ Siding is delivered with our exclusive performance-enhanced primer applied at the factory. It can be finished with any high-quality exterior paint (acrylic or oil-based) or solid stain. For a comprehensive list of approved paints, visit our website. Because of its minimal water absorption, it can be site finished as soon as the surface is dry.

> **How do I maintain _HomePlate_ Siding?**

_HomePlate_ Siding promises years of low maintenance, because of its impact and rot resistance, its minimal water absorption and stable material which promotes long paint life. For full maintenance instructions please see our website at www.boisehomeplate.com.

> **Who's behind _HomePlate_ Siding?**

_HomePlate_ Siding has been developed, extensively tested and backed by the Architectural Products Division of Boise, a Fortune 500 company.

> **How can I find out more?**

Visit us online at www.boisehomeplate.com to find out more about our products, our company, our warranty and all the advantages _HomePlate_ Siding offers to builders and homeowners.

Or call us at 1 866 274-6758.

BC   047235





HOME PLATE™
Siding



### Product Specifications

*HomePlate*™ Siding is polyethylene encapsulated wood fiber formed using proprietary high-pressure and high-heat technology. *HomePlate* Siding products do not contain PVC, silica, fiberglass, asbestos, or formaldehyde.

Weight:    1.9 lbs./sq. ft

Thickness:  7/16" nominal

Available Widths:

        5" exposure
        7" exposure
        10 3/4" exposure

Length:    16'

### Combustibility and Surface Burning Ratings

When tested in accordance with ASTM E84-97A
Class C

### Want to find out more?

Visit www.boisehomeplate.com

Call 1 866 274-6758

Boise
Architectural Products
1111 West Jefferson Street
Boise, Idaho 83728

HP1000S — 1/03

## Building Protection™

Boise, HomePlate, the Knight design, Building Protection, Building Peace of Mind are trademarks of Boise Cascade Corporation.
© 2003 Boise Cascade Corporation

BC  047236

BOISE™



Building Protection™

BC   047237

A Boise Building Solution



Building Protection™

BC   047238

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CERTAINTEED CORPORATION,                  :

        Plaintiff,                      :          Civil Action No. 02-2677

          v.                           :          Hon. William H. Yohn

BOISE CASCADE CORPORATION,                :

        Defendant.                      :

**EXPERT REPORT OF MANNY D. POKOTILOW, ESQ.**
**April 25, 2003**

The Plaintiff, Certainteed markets its services as set forth above to builders, architects, remodelers and home inspectors whereas Boise Cascade markets its products to original equipment manufacturers, wholesale distributors and "big box" retailers such as Home Depot and Lowe's. Both Plaintiff and Defendant use brochures and trade advertising.

Factor 8 - the extent to which the targets of the parties' sales efforts are the same:

As set forth above with respect to factor 7 the targets of the parties' sales efforts are not the same for the most part.

Factor 9 - the relationship of the goods in the minds of consumers because of the similarity of function:

As set forth above, the Plaintiff, Certainteed utilizes the mark BUILDING SOLUTIONS in association with education and incentive programs for its customers, whereas the Defendant Boise Cascade utilizes the words BUILDING SOLUTIONS in association with its distribution service for the products it distributes.

Factor 10 - other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market:

This factor is for the most part negated by the fact that it is unlikely that any customer or member of the consuming public would be aware of Boise Cascade's use of the words BUILDING SOLUTIONS. Similarly, Certainteed also would not have any public recognition of the words BUILDING SOLUTIONS. With respect to the customers for both the Plaintiff's services and the Defendant's services, because the words BUILDING SOLUTIONS are always utilized in association with the house mark of the parties, there is little likelihood that a customer of Boise Cascade would

25

## CERTIFICATE OF SERVICE

I, Lynn E. Rzonca, an attorney, certify that a true and correct copy of the foregoing Plaintiff's Response to Opposition to Preclude the Proposed Testimony and Expert Report of William Weilbacher, and proposed Order were served on counsel for Defendant on June 5, 2003 as set forth below:

Via U.S. Mail
Ramsey M. Al-Salam, Esq.
Perkins Coie LLP
1201 Third Ave.
Suite 4800
Seattle, WA 98101-3099

Via U.S. Mail
David L. Grove, Esq.
Montgomery McCracken
Walker & Rhoads LLP
123 S. Broad St.
Philadelphia, PA 19109

Via U.S. Mail
Jeffrey D. Neumeyer, Esq.
Boise Cascade Corp.
1111 W. Jefferson St.
P.O. Box 50
Boise, ID 83728-0001

Lynn E. Rzonca

Dated: June 5, 2003